577 So.2d 241 (1991)
Gary Bernard KNAPP
v.
Applying for ADOPTION OF Christy Michelle COTTEN.
No. 90 CA 1231.
Court of Appeal of Louisiana, First Circuit.
March 5, 1991.
Writ Denied May 17, 1991.
*242 Ernest S. Anderson, Slidell, for appellee-plaintiff.
Bennett Wolff, New Orleans, for appellant-Father.
Before EDWARDS, WATKINS and LeBLANC, JJ.
WATKINS, Judge.
Defendant, Jerry R. Cotten, the natural father, appeals the granting of an adoption of his minor daughter, Christy Cotten, by her stepfather, Gary Bernard Knapp.
Gary Bernard Knapp applied for the adoption of his stepdaughter, Christy Michelle Cotten, the natural child of his present wife, Iva Charmaine Knapp, pursuant to the provisions of LSA-R.S. 9:422.1, which permits adoption of a child by a stepparent whose spouse is a legitimate parent without the consent of the child's other legitimate parent when that parent has refused or failed to comply with a court order of support for a period of one year.
Jerry R. Cotten admitted that he failed to pay the court ordered support for one year prior to the petition for adoption, but he alleged that because of his financial problems he and his ex-wife agreed to defer child support until he was able to sell his home. Mr. Cotten further alleged that the adoption was not in Christy's best interest.
*243 The trial judge found that the requirements of LSA-R.S. 9:422.1 had been met and that there was no agreement to defer the child support payments. The judge further found that the adoption would be in Christy's best interest.[1]
Jerry R. Cotten appeals alleging, inter alia, that the adoption is not in Christy's best interest.[2]

FACTS
Jerry R. Cotten and Iva Charmaine Knapp were married on November 20, 1976, in North Carolina, and one child, Christy Michelle, was born of their union on January 12, 1981. The couple separated shortly thereafter and on April 16, 1982, Mrs. Knapp was granted custody of Christy, subject to visitation rights in favor of Mr. Cotten. The court further ordered Mr. Cotten to pay $200.00 per month child support. On May 5, 1982, a divorce was rendered. In July of 1982, when Christy was eighteen months old, Mrs. Knapp moved to Louisiana with Gary Bernard Knapp; she married him in August of 1982.
From the time of his separation from Iva Charmaine Knapp, through 1983, Mr. Cotten telephoned Christy approximately once a week. He exercised visitation every other weekend until Christy moved to Louisiana. Thereafter, Mr. Cotten had Christy visit with him for several weeks at a time, twice a year. Mr. Cotten also called Christy every few months and sent flowers on her birthdays. Mr. Cotten's attempts to visit with Christy for extended periods of time prompted Mrs. Knapp to petition the court in 1984 to reduce visitation because of Christy's age and the effect the long separations from her mother would have on her. The court modified the previous custody agreement to provide that Mr. Cotten was entitled to a total of eight weeks visitation per year, and that until Christy was ten years old the maximum time per visit would be two weeks.[3] Mr. Cotten was required to give a 20-day notice prior to each visit. The court order also provided that the plaintiff and defendant consult together frequently by telephone or correspondence in an effort to mutually agree in regard to the general health, welfare, education and development of the minor. Neither party was to attempt or condone any attempt, by artifice or subterfuge, to estrange the child from the other party or injure or impair the mutual love and affection of the child. The court order also mandated that "the parties shall encourage and foster in the child sincere respect and affection for both parents and shall not hamper the natural development of the child's love and respect for the other parent."
Since 1984 Christy visited with her father on the following dates:
December 24, 1984January 8, 1985
August 24, 1985September 14, 1985
December 26, 1985January 8, 1986
July 26, 1986August 14, 1986
December 13, 1986December 26, 1986

*244 August 1, 1987August 22, 1987
December 27, 1987January 1, 1988
On July 27, 1988, Mr. Cotten attempted to arrange a visit with Christy. However, Mrs. Knapp informed him that they had made previous plans and would be visiting her parents for three weeks. Mrs. Knapp's parents live in South Carolina, approximately four to five hours from Mr. Cotten. Although Christy was only four to five hours away, Mrs. Knapp refused to permit Mr. Cotten to visit with Christy. On December 14, 1988, Mr. Cotten called and spoke to Christy; Mrs. Knapp was not at home. Mr. Cotten called again on December 24 to arrange a visit; although this visit was denied, he admitted that he did not comply with the 20-day notice requirement. During the phone conversation on December 24, Mr. Cotten and Mrs. Knapp engaged in a heated discussion concerning Christy and Mr. Cotten's visitation. It was finally agreed that if it could be worked out, Mr. Cotten could visit with Christy over the Mardi Gras holidays. Mrs. Knapp did not inform Mr. Cotten that the petition for adoption had been filed on December 12, 1988, and that her attorney advised her not to allow Mr. Cotten to visit Christy until the proceedings were complete. At this point Mr. Cotten had not seen Christy in one year. It would be another eight months before he would see his daughter, and then only in the company of a psychologist for the purpose of evaluation. Another three months would pass before the final hearing in the adoption was held.
The evidence also shows that since the time of their separation Mrs. Knapp has done little to encourage and foster the relationship between Christy and her father. During this time Mr. Cotten has never received a telephone call from his daughter, although he asked that she call him collect any time. Christy has sent no correspondence or cards, although Mr. Cotten requested it and provided self-addressed stamped envelopes. Mrs. Knapp has not called or corresponded with Mr. Cotten concerning Christy except to inquire about child support, and in 1986 when she and Mr. Knapp were trying to obtain Mr. Cotten's consent to adopt Christy.[4] Despite repeated requests from Mr. Cotten, Mrs. Knapp has condoned Christy's referring to her father by his first name instead of "Daddy." Notwithstanding the court order to the contrary, Mrs. Knapp testified that it was not her place to encourage the relationship between Mr. Cotten and Christy. The documented evidence of letters sent by Mr. Cotten to Mrs. Knapp and to his attorney throughout the years since he and Mrs. Knapp divorced shows that Mrs. Knapp has been less than cooperative concerning Christy's relationship with her father and that Mr. Cotten consistently pleaded with Mrs. Knapp to cooperate for Christy's sake. Mr. Cotten also testified that he did not instigate legal proceedings against Mrs. Knapp because he did not want the situation to get any worse between them. Instead, he tried to appease Mrs. Knapp whenever he could.
The uncontradicted evidence shows that from April 16, 1982, through August 1987, Mr. Cotten was current in his child support payments. He admits that from December 8, 1987, through January 20, 1989, he failed to tender any child support payments to Mrs. Knapp. He testified that during this period he was experiencing both financial and health problems. In August 1987 he and his current wife separated, creating financial difficulties, and in October he injured his eye and suffered a detached and torn retina. In December of 1987 he underwent surgery and was unable to return to work until January, 1988. Subsequently, on February 10, 1988, he was laid off from his employment and remained unemployed until June of 1988. After receiving a letter from Mrs. Knapp in March of 1988 concerning his failure to pay child support, *245 Mr. Cotten phoned Mrs. Knapp to discuss his financial difficulties. He advised her that when his house sold, he would pay the full amount owed. Mrs. Knapp's response was, "Fine. I'll believe it when I see it." A similar conversation took place in July of 1988. Mr. Cotten's home sold in December of 1988, and he tendered the full amount of the child support arrearages on January 20, 1989. Mr. Cotten insists that he sent the money before he knew about the petition for adoption. He was given notice of the petition for adoption on January 23, 1989, and immediately contacted his attorney to contest the adoption.
Patricia Aptaker, a licensed psychologist, evaluated Christy and Mr. and Mrs. Knapp early in 1989. Dr. Aptaker saw Christy and Mr. and Mrs. Knapp[5] five different times, alternating sessions with the family and with Christy alone. Dr. Aptaker concluded that Christy was a well-adjusted child and that she was comfortable with her family. When she discussed Mr. Cotten with Christy she stated that Christy did not seem afraid of him but that she said "I don't want to see him. I might see him, but I don't want to see him." Dr. Aptaker, concluding that Christy sees Mr. Knapp as her psychological father, made the following observations concerning the adoption by Mr. Knapp.
I think the advantages of adoption in this case revolve in part around the family unit, strengthening its identity. Again, the family is functioning, I would consider, above average, quite adequate.
At the same time, the parents, I think, have a certain amount of apprehension about Christy's future and how to make decisions and the fact that she offers hesitation in going to visit Mr. Cotten and does not seem to relate, respond to the invitation to have a relationship with him.
So I think the major advantage or one of the major advantages would be to strengthen the family identity.
I think she, Christy, has developed, for whatever reason, some insecurity about what decisions can be made for her. I don't consider the insecurity to be one that's dysfunctional. I think she has some insecurity and so the adoption would, I think, settle some of the insecurity around that area.
I don't see any immediate effects for Christy or, any negative effects in her being adopted. I don't think that it would make a difference in her day-to-day functioning. I think the long term effects are always harder to predict.
I think in this case and on an immediate level the advantages, in terms of strengthening the family and allowing some security on the part of the child, outweigh the disadvantages on a short term basis.
On cross-examination Dr. Aptaker stated that when she made her evaluations, she did not know about the conversations that Mr. and Mrs. Knapp had with Christy concerning her adoption. Dr. Aptaker admitted that Christy could have gotten the message from Mr. and Mrs. Knapp that it was not "okay" to have positive feelings about Mr. Cotten. She further stated that she probably would have encouraged the child to send cards to her father, stating that such encouragement could have enhanced Christy's relationship with her father. Dr. Aptaker does not think Christy will be significantly hurt if the adoption is denied. Furthermore, Dr. Aptaker saw no evidence of abuse or neglect by Mr. Cotten. She would have liked to have evaluated Mr. Cotten, and she stated that she might have suggested that the adults work together, as that was the general approach she took with divorced families.
Valerie Fleming Turgeon, a psychologist, also evaluated Christy and her father in August of 1989. Dr. Turgeon spent four hours talking alternately with Christy, Mr. Cotten, and Sharon Merchant, a friend of Mr. and Mrs. Knapp, who took Christy to the evaluation. This evaluation was conducted without Mr. Cotten's being permitted to spend any time re-establishing his relationship with his daughter after a separation *246 of 19 months.[6] Although Christy was apprehensive at first and did not relate to her father, she became more relaxed as the interview went on. She expressed to Dr. Turgeon that she was anxious about going to visit her father but that once she got there it was okay.
When asked if she thought Christy would benefit emotionally from the adoption, Dr. Turgeon replied:
Well, I think that was one of the things that led to my recommendation against it. I guess from the sense that if it's not broke; don't fix it. And that in talking to Christy I made a point of asking questions about how did she feel in the family when her name was different from the other family members and what she suggested to me was she didn't notice that. She didn't pay attention to it and it wasn't a problem for her, that she didn't feel any different from other members of the family.
From the testimony that I heard from Mr. Knapp aboutI think it was from Mr. Knappher being named in his will, that essentially he had provided for her in the same way as if she were his natural child. So the adoption wouldn't do anything different there from the description of Mr. Knapp and Mrs. Knapp about how well integrated Christy was into the family. And from Mrs. Merchant's description, too, I couldn't see how the adoption would add to that other than to deal with Mrs. Knapp's apparent concern about what would happen, you know, in the case that she should die and plans would have to be made for Christy.
So I guess I had difficulty in seeing how it would improve her situation and what it appeared to me was that it would cut out the possibility of another relationship but wouldn't do anything that I could see that would solidify what was already there.

LAW
The primary consideration in adoption proceedings is whether the adoption is in the best interest of the child. In Re J.M.P., 528 So.2d 1002 (La.1988). Even where the natural parent's consent is obviated because of his non-support, the court must consider whether the adoption is in the best interest of the child. Adoption of Latiolais, 384 So.2d 377 (La.1980).
The adoptive parents bear the burden of proving the adoption is in the child's best interest. In Re J.M.P., 528 So.2d 1002. There are a multitude of factors to consider in determining the best interest of the child. The most important factors are the child's relationship with her stepfather and her natural father. It is not enough to examine the love and home environment provided by the petitioner/stepparent. It is necessary as well to examine the depth of closeness of the child's ties with the non-custodial natural parent, and the effect which the loss of this relationship would have on the child. In Re JGG v. JLF, 556 So.2d 236 (La.App. 2d Cir.1990). The court must also consider the seriousness and finality of the severing of the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent. Id.
It is apparent from the record in the instant case that all of the parties involved are fit parents and that they all care deeply for Christy. The testimony reveals that Christy has a wonderful nurturing home life with her mother, stepfather and half-sister. Mr. Knapp testified that he loves Christy as if she were his own and that in his will he has provided equally for Christy and his natural daughter, Cassie. These circumstances will not change regardless of whether the adoption is granted.
On the other hand, Christy's relationship with her natural father has not developed as it could have for various reasons, not all of which can be attributed to Mr. Cotten. The evidence shows that while Christy resided in North Carolina, Mr. Cotten visited with her every other week and called her *247 every week. However, after Christy moved to Louisiana, the distance and Christy's age made frequent and extended visits difficult. Nevertheless, Mr. Cotten visited twice a year with Christy for shorter periods of time, called her every few months, and sent her flowers on her birthday. Mr. Cotten's commitment to his daughter is further demonstrated by his attendance and representation at the 1984 hearing to reduce visitation, wherein he made known to the court his concern over his visitations with Christy and the lack of cooperation on the part of his ex-wife. As noted above, the judgment rendered on the motion to reduce visitation expressly provided for these concerns and mandated that Christy's parents work together to encourage her relationship with both of her parents. The documented correspondence over the years shows that Mr. Cotten constantly pleaded with his ex-wife to cooperate with him and to encourage Christy to call him collect or to write to him. Mr. Cotten also requested that Mrs. Knapp provide him with copies of Christy's school report cards or anything that she thought he might like to see. Mrs. Knapp sent him one brochure on a school Christy was attending, with no explanation or comments on how Christy liked the school or how well she was doing. The lack of communication and cooperation between Mrs. Knapp and Mr. Cotten is further illustrated by the two unsuccessful visitation attempts in 1988.
The conduct we find most egregious, however, is the refusal of Mrs. Knapp to permit visitation during the pendency of these proceedings. This conduct further estranged Mr. Cotten and Christy, and in our opinion had an impact on the subsequent evaluations of Christy by Dr. Turgeon and Dr. Aptaker.
It is also a concern of the court that Mr. and Mrs. Knapp began discussing adoption with Christy when she was five years, nine months old, knowing that they could not obtain the adoption without the consent of Mr. Cotten, which he adamantly refused. Both psychologists agreed that this type of conduct could produce a loyalty conflict within the child. Dr. Turgeon also expressed that young children, in order to please the parents they live with, often do what the parents want them to do. We find that these types of discussions with Christy were inappropriate, not only because of her age, but because there was no reason to undermine her relationship with her natural father, who at that time was current with his child support and exercised regular visits with his daughter.
Whether an adoption is in the best interest of a child must be decided on the particular facts of each case, and the trial judge is vested with great discretion. In Re G.E.T., 529 So.2d 524 (La.App. 1st Cir. 1988). This discretion is not absolute, and the trial judge's determination of best interest is subject to reversal if the record reveals manifest error in his determination. In Re EWB, 441 So.2d 478 (La.App. 2d Cir.1983).
Louisiana courts have historically been reluctant to sever the parent-child relationship and derogate from the natural rights inherent therein.[7] The reluctance to sever the parent-child relationship is rooted in the fundamental belief that a child has a right to know and love its parents and such rights should not be denied them except when the parent has proven himself unworthy of this love. In Re Glass Applying For Adoption, 424 So.2d 383 (La.App. 2d Cir.1982). The failure to make support payments is not, of itself, sufficient proof of that unworthiness. Id.
We believe that the evidence as a whole does not support the trial court's determination that the adoption is in Christy's best interest. We cannot agree with the trial court's conclusion that Mr. Cotten has not made any effort to establish a meaningful relationship with Christy. Although Mr. Cotten's efforts perhaps were not sufficient to foster a meaningful *248 relationship with Christy, we cannot say that his efforts were insignificant given the circumstances with which he was confronted (i.e., distance, Christy's young age, lack of cooperation of custodial parent).
Although Mr. Cotten failed to pay support for one year prior to the petition for adoption, it was established that he was current with his child support obligations for the previous five years. He also tendered the full amount of arrearages one month after the adoption petition was filed.[8] We certainly do not condone the failure to pay child support; however, we cannot ignore Mr. Cotten's past history of support, nor his efforts to pay his arrearages, in the context of his love for his daughter and his commitment to provide for her.
Furthermore, we find error in the trial court's statement of Dr. Turgeon's reason for recommending denial of the adoption. To conclude from Dr. Turgeon's testimony that "the most she could offer" for denying the adoption was that "Mr. Cotten would be deprived of the opportunity to establish a relationship with Christy" is clearly wrong. Dr. Turgeon stated, among other reasons, that "children do better when they're allowed to have relationships or encouraged to have relationships with all the people in their immediate or extended families and that that's preferable to the idea of choice." Dr. Turgeon further stated that her reason for not recommending the adoption was because it would deny Christy the relationship with her biological father.
Mr. and Mrs. Knapp contend that the adoption is in the best interest of Christy because she does not like to go and visit her father and that she will suffer emotional problems from being forced to have a relationship with him.[9] The Knapps produced no evidence that Christy was detrimentally affected by the visits with her natural father except that she missed her family and that she clung to her mother for several days after she would return. The evidence further showed that as Christy got older these problems diminished somewhat. Both psychologists testified that Christy was not afraid of her father, and that she was only apprehensive about visiting with him until she got there and had time to adjust. It would seem that these reactions are perfectly normal for a young child who gets to visit her father only twice a year.
The primary reasons given by Dr. Aptaker in support of the adoption are the strengthening of the identity of the family unit, which Dr. Aptaker stated was functioning above average, and providing more security to Christy, although Dr. Aptaker concluded that Christy's insecurities were not dysfunctional.
It is generally agreed that the adoption will bond Christy closer to her family and provide additional stability. While these facts may be true, the court is reluctant to sever Christy's relationship with her father to accomplish these goals when the evidence shows that her relationship with her family is already very secure. Both psychologists agree that Christy is a well adjusted child, comfortable in her family unit, and that she is not in need of counselling to deal with her relationship with her father. Neither psychologist offered any testimony as to how continuing her relationship with her father would detrimentally affect the minor. In fact, both psychologists testified that they believed that the denial of the adoption would not have a negative effect on Christy.
After considering all the evidence presented at trial, we believe that the best interests of Christy are served by the reversal of the trial court judgment granting the adoption to Gary Bernard Knapp. Christy is in a stable loving environment provided by Mr. and Mrs. Knapp, and she will continue to benefit from their love and counselling. However, we are convinced *249 her interests would be best served by continuing to develop a relationship with her natural father and her relatives on her father's side of the family.
For the reasons set forth the judgment of the trial court granting the adoption and ordering the child's name to be changed is reversed and the petition for adoption is denied. Costs to be borne equally by the appellant and appellee.
REVERSED.
NOTES
[1] His reasons were as follows:

The Court is impressed that the child is in a secure atmosphere which is manifestly beneficial to her and all the testimony concerning the family and the adoption was positive and recommending of the adoption.
During the course of the hearing, petitioner called Dr. Aptaker, a clinical psychiatrist [sic] well known to the Court, who testified that she had examined the child and the family and that, in her professional opinion, it would be to the benefit of the child to have the adoption completed. Mr. Cotten, in his behalf, had Dr. Valerie Turgeon, a developmental psychologist, also well known to the Court, examine the child and himself and, in recommending against the adoption, the most Dr. Turgeon could offer was that, if the adoption went through, it would deprive Mr. Cotten of the opportunity to establish a meaningful relationship with his daughter. The Court finds this insufficient to deny the adoption because Mr. Cotten has not, over a period of years, made any effort to establish a meaningful relationship between himself and his child and there is no reason to expect that he would make such an attempt at this point.
[2] Because we find that the adoption is not in the best interest of Christy, we pretermit any discussion of the remaining errors, including that Jerry R. Cotten had just cause for failure to pay support, that the trial court failed to apply the proper standard of proof, and that LSA-R.S. 9:422.1 is unconstitutional.
[3] After Christy's tenth birthday, Mr. Cotten would be permitted to have her for extended periods when she was not in school.
[4] It was established that in October of 1986, when Christy was five years and nine months old, that Mr. and Mrs. Knapp discussed Mr. Knapp's adopting her. They told her that it would mean that she would have the same last name as Mr. Knapp and that she could not visit with her father without their permission. When they wrote to Mr. Cotten to request his consent for the adoption, Mr. Cotten wrote back and flatly refused. Mr. and Mrs. Knapp testified that all of this correspondence was read to Christy.
[5] Dr. Aptaker did not see Mr. Cotten although she would have recommended it.
[6] Both Dr. Turgeon and Dr. Aptaker suggested that the minor and her father spend some time together before the evaluation. For reasons which are not apparent from the record, Mr. Cotten did not see his daughter before the evaluation.
[7] Adoption of Latiolais, 384 So.2d 377 (La.1980); In Re PS, 535 So.2d 1052 (La.App. 2d Cir.1988); In Re G.E.T., 529 So.2d 524 (La.App. 1st Cir. 1988); In Re Adoption of JSB, 505 So.2d 796 (La.App. 2d Cir.), writ denied, 508 So.2d 819 (La.1987); In Re EWB, 441 So.2d 478 (La.App. 2d Cir.1983); In Re Glass Applying For Adoption, 424 So.2d 383 (La.App. 2d Cir.1982).
[8] Mrs. Knapp refused to accept the tendered checks, which she returned to Mr. Cotten.
[9] Mr. and Mrs. Knapp testified that at one point Christy was uncomfortable with the fact that her last name was different from the rest of her family and that sometimes she would write her name using the last name of her stepfather. Both Dr. Turgeon and Dr. Aptaker were asked about this concern, and both doctors related that this was not a concern for the child.