712 So.2d 998 (1998)
In re Brian E. SEVIN, Applying for Intra Family Adoption of C.E.D.
No. 97-CA-1145.
Court of Appeal of Louisiana, Fifth Circuit.
May 13, 1998.
John J. Lee, Jr., New Orleans, for Defendant/Appellant.
Jerry W. Sullivan, Daigle, Sullivan, Dupre' & Aldous, Metairie, for Plaintiff/Appellee.
Before DUFRESNE, WICKER and CANNELLA, JJ.
WICKER, Judge.
This appeal arises from an adoption petition filed on behalf of B.E.S., K.T.'s husband, seeking to adopt C.E.D., who is K.T.s' daughter. S.R.D., the child's father, opposed the adoption. At the time of trial the child was five years of age. The trial judge granted the adoption and S.R.D. now appeals. We affirm.
Appellant specifies as errors the trial judge's finding that his consent was unnecessary and that it was in the child's best interest that the adoption be granted. We find no manifest error in the trial judge's conclusions.
K.T. and S.R.D. were married in 1991. Their daughter, C.E.D., was born later that year. In 1994 K.T. filed for divorce. K.T. was awarded sole custody of the minor child. Child support was set in a 1994 consent judgment. The amount of child support paid by S.R.D. was stipulated. It is uncontroverted that S.R.D. failed to pay any amount of court-ordered child support from June 1995 through September 1996, a period of 16 months. Partial child support payments resumed in October 1996. In May and June 1997 S.R.D. began making full child support payments in addition to an amount toward the arrearages.
An intra-family adoption is recognized as an adoption procedure. La. Ch.Code art. 1170. "A stepparent married to the parent of a child, provided that the parent is recognized as having parental rights in accordance with Article 1193," may petition for intra-family adoption. La. Ch.Code art. 1243. S.R.D.'s consent to the adoption is required. La. Ch.Code art. 1193. However, B.E.S., plaintiff/appellee, alleged he was entitled to adopt the child without the consent of *999 the biological father pursuant to La. Ch.Code art. 1245(D)(1).[1] The article provides:
A. The consent of a parent as required by Article 1193 may be dispensed with upon proof of the required elements of either Paragraph B, C, or D....
D. When a parent lawfully exercising actual custody of the child is married to a stepparent petitioner and either of the following conditions exist:
(1) The other parent has refused or failed to comply with a court order of support for a period of one year ...
This court has held that the one-year period of nonpayment need not be immediately before the adoption proceeding is instituted. Stevenson v. Jenkins, 424 So.2d 520 (La.App. 5th Cir.1982). In Jenkins we examined the natural father's entire history of payment. Although he was incarcerated for nine months prior to the filing of the adoption petition, he had given no support for the two-year period prior to the incarceration.
Appellant argues he has paid regular child support payments prior to the adoption. Although S.R.D. did obtain a reduction in child support and did resume paying child support within 12 months prior to the filing of the adoption petition, he owed a significant amount in child support arrearages by the time the petition was filed. At the time of trial he had begun paying an additional amount each month toward the arrearages as a result of a consent judgment. It was stipulated his arrearages totaled approximately $12,000.
In In Re Lambert, 545 So.2d 1122 (La.App. 5th Cir.), writ denied, 548 So.2d 338 (La. 1989) we explained at 1123:
The jurisprudence has held that once non-payment of Court-ordered child support has been shown, it is the natural parent's burden to prove that he had just cause not to pay or that the failure to pay resulted from circumstances beyond his control.... Where a parent has made only partial payment within a year of the adoption petition, support payment must have been significant for the statute not to be applicable [citations omitted.]
The trial judge correctly found that S.R.D. had not paid a significant amount of child support and had a 16-month period of nonpayment resulting in arrearages totaling $12,000.
However, our inquiry does not end with this finding. As noted by this court in In Re Lambert S.R.D. had the "burden to prove that he had just cause not to pay or that the failure to pay resulted from circumstances beyond his control." Id.
Appellant argues the trial judge erred in concluding he did not establish just cause for his failure to pay child support. S.R.D. testified that he paid no child support from May 1995 to October 1996 because he had no knowledge of the whereabouts of his child or of K.T. and B.E.S. He also stated, that although he knew the address of K.T.'s mother, he did not think it proper for him to send child support payments to K.T.'s mother's home.
He explained that he stopped making payments in May 1995 because he was unemployed. Prior to this period of unemployment, he was self-employed in the landscaping business. He became employed once again on May 8, 1996. At that time he filed a motion to modify custody and child support. Despite his employment in May 1996 he made no child support payment until October 1996.
In Burson v. Lasseigne, 337 So.2d 663, 665 (La.App. 3rd Cir.1976) the court held:
A parent ordered to pay child support is not relieved of that duty merely because his spouse has failed to provide him with the child's address. Rather, he must make an attempt to determine the child's whereabouts in an effort to comply with the support order. See In re Daigle, 232 So.2d 548 (La.App. 1st Cir.1970).
In the instant case there is uncontroverted testimony that S.R.D.'s brother and sister sent a Christmas gift to C.E.D. at K.T.'s *1000 mother's address and that K.T.'s mother gave the gift to C.E.D. Thus, there is no showing that S.R.D. could not have used this avenue to send child support payments.
Furthermore, the trial judge correctly noted that after S.R.D. became employed in May 1996 he still failed to make child support payments until October 1996. Appellant argues the trial judge erroneously concluded that it was only after the petition was filed that S.R.D. began making the court ordered child support payments. Appellant states that the stipulation shows S.R.D. paid court ordered child support payments before the petition was filed. We agree that the stipulation shows S.R.D. made payments before the filing of the petition. Evidently the trial judge was referring to S.R.D.'s making payment on the arrearages for the first time after the petition was filed. No payment toward the significant amount of arrearages was made by S.R.D. until May 1997. The arrearages constituted the delinquent portion of the court ordered child support.
The next inquiry concerns the best interests of the child. La. Ch.Code art. 1255. The article provides:
A. The court, after hearing and after taking into consideration information from all sources concerning the intra-family adoption, may enter a final decree of adoption, or it may deny the adoption. The basic consideration shall be the best interests of the child.
B. When a court has granted custody to either the child's grandparents or his parent married to the stepparent petitioner, there shall be a rebuttable presumption that this adoption is in the best interests of the child.
In July 1994 K.T. was awarded sole custody of C.E.D. Under these circumstances the issue in this case is whether S.R.D. rebutted the presumption that the adoption was in the best interests of the child. The trial judge concluded he had not done so. In In re EWB, 441 So.2d 478, 481 (La.App. 2nd Cir. 1983) the court stated:
Whether an adoption is in the best interest of the child must be decided on the facts of each case and the trial judge is vested with great discretion in making that determination. This discretion is not absolute and the trial judge's determination of best interest is subject to reversal if the record reveals manifest error in his determination [citations omitted.]
The trial judge gave extensive reasons for judgment. We have reviewed the record and conclude she was not manifestly erroneous.[2] She concluded that the stepfather provided C.E.D. with love, support and a stable home while S.R.D. never established a meaningful bond with C.E.D. She heard conflicting testimony regarding S.R.D.'s relationship with his daughter. On one hand, B.E.S.'s witnesses testified that C.E.D. was fearful of her father because he was aggressive toward her mother and people she loved. In contrast, S.R.D.'s witnesses testified he enjoyed a good relationship with his daughter. C.E.D. was ultimately seen for therapy in order to work on her relationship with her father. Gail Pesses, a social worker, performed a custody evaluation and observed S.R.D.'s interaction with his daughter on July 25, 1996. She observed that C.E.D. was very fearful of her father. She recommended that S.R.D. not have visitation until C.E.D.'s therapist considered it appropriate.
The following reasons given by the trial judge are supported by the record:
In the instant matter, the testimony shows that B.E.S. has provided a stable loving home for C.E.D. Even before he married K.T., he went over to visit every evening, bringing his "play clothes" with him. He would play with C.E.D., have dinner with the family and then read her bedtime stories. This fact was established through the testimony of B.E.S. and K.T. and was undisputed. B.E.S. has known K.T. since 1992 approximately. They met *1001 through the marriage of B.E.S.'s brother to K.T.'s sister. They began dating in August 1994. B.E.S. and K.T. were married in December 1995 and have since had a son. C.E.D. has lived with B.E.S. and K.T. since the marriage. B.E.S. and K.T. have testified that C.E.D. loves her little brother very much.
The testimony of Gail Pesses indicates that C.E.D. is presently in a loving stable home where she feels secure and safe. B.E.S. has been involved in C.E.D.'s life since she was just three years old. B.E.S. has carefully earned C.E.D.'s trust and now at age 5, she has begun calling B.E.S. "Dad."
B.E.S. testified that if C.E.D. wanted to have a relationship with her natural father, he would "go through hell and high water" to make that happen. It is clear to this court that B.E.S. has not only provided a stable, loving, safe and supportive environment in which this child can grow, but also that his main focus for this child is her best interests.
By stark contrast, S.R.D.'s relationship with his child has been unstable and unsafe. K.T. testified that he would go out at night and not tell her where he was or when he was coming home. K.T. testified that he was violent when he was drunk and depressed when he was sober. She further testified that at times he wold lock her and C.E.D. out of the house. Again, this testimony is undisputed. Testimony indicated that S.R.D. was often "rough" with his baby girl, to the point of alarming several family members. There were numerous altercations between S.R.D. and K.T. in the presence of C.E.D. causing her to be fearful.
When K.T. left the matrimonial domicile, C.E.D. was about two and one half years old. K.T. testified that C.E.D. was upset that her father vomited and urinated on her stuffed toys when he was in a drunken stupor.
After the separation, S.R.D. was granted supervised visitation with C.E.D. The supervision was to take place at the maternal grandparents' home and with the maternal grandparents supervising. The testimony of the grandmother and grandfather indicated that S.R.D. was drunk upon arrival at the visitation on many occasions, that he arrived late and was often disrespectful and loud. He would not pay much attention to C.E.D.
The maternal grandparents finally decided that because of his threats and out of control behavior that they did not want to be responsible for the visitation supervision. K.T. and B.E.S. would then supervise the visits until they found S.R.D.'s behavior intolerable and the visits were moved to the Divorce Center.
At the Divorce Center, K.T. and B.E.S. would sit at the coffee shop across the street during the visits. K.T. and B.E.S. both testified that C.E.D. would look out of the window at them during the visits. They noticed S.R.D. taking cigarette breaks instead of attempting to bond with his daughter.
Finally, C.E.D. became hysterical at the thought of visitation with her father and refused to go to the Divorce Center. She became upset at the thought of dancing lessons on Saturday which she came to associate with visitation. She was having nightmares about the visitation. She was frightened of her father.
S.R.D. disputes the testimony that he arrived at visitation drunk. He said that he would drink the night before a visit but not the day of the visit ...
Gail Pesses, MSW, and Supervisor of the custody Evaluation and Mediation Program at Family Service of Greater New Orleans did an evaluation of S.R.D., K.T., B.E.S. and C.E.D. In her evaluation, Gail Pesses relates that she obtained information from Dr. Elaine Salzer regarding S.R.D.'s problem. Gail Pesses states in her report that:
Dr. Salzer says that [S.R.D.] was in denial about the extent of his problems at first, but that after he was confronted, he agreed to treatment. She feels that he is gradually coming out of his denial and minimization. She says that he has not yet recognized the responsibility or the effect of his own behavior in creating the *1002 present problems with his visitation with [C.E.D.] [Emphasis in original.]
Given this information about S.R.D.'s denial and minimization of his problem and its effect on his daughter, the court is compelled to give more credibility to the testimony of K.T. and B.E.S. that he did arrive drunk and unruly at his visits.
S.R.D. filed pictures of his visits into evidence. The pictures depict holiday festivities and gift giving situations. These pictures show a little girl enjoying the festivities, however, they do not show much more than that. They certainly do not overcome the testimony of the mother, the stepfather who testified to nightmares and fits of hysteria at the anticipation of visits with her father. These pictures do not overcome the testimony of the expert who recommends that the father should not even have supervised visits with the child at this time. The court is simply not compelled to give much, if any, weight to the probative value of these pictures.
Gail Pesses did not recommend visitation at the time of her evaluation. Her testimony on the date of trial of this matter indicated that she still did not feel that visitation was appropriate. She feels that a lot of work is needed to reach a point that visitation between C.E.D. and her natural father could be reestablished.
Michelle Kelly, the child's therapist, also testified that she does not feel that visits with C.E.D. and her father are appropriate at this time ...
Both therapists testified that C.E.D. is happy and well adjusted, that she is in a happy family. They testified that it would not be harmful to C.E.D. for the parental ties between C.E.D. and S.R.D. to be severed.
When considering the testimony of S.R.D., the court determined that he was doing the things he was told to do in order to reestablish visitation. He proffered evidence as proof that he is attending Alcoholics Anonymous meetings and has attended parenting classes. He proffered proof that he has submitted to random drug screens which were negative. He testified that he is attending therapy sessions with Dr. Elaine Salzer. Even considering all of the evidence proffered and giving it all of the weight that it would be due had it been admitted into evidence, it would not alter the Court's decision in this matter.
S.R.D. began to "get his act together" in May 1996 just before C.E.D.'s 5th birthday. There is still a long way to go and a lot of work to do just to reach the point when supervised visitation can be reestablished.
In State in the Interest of M.P., 538 So.2d 1112 (La.App. 5th Cir.1989), in a termination of parental rights matter, the court noted that "while adults can take years to improve their functioning, children are not granted the same amount of time, and their lives are significantly disrupted while their parents are attempting to deal with their problems." Although that quote was taken from a case involving an involuntary termination of parental rights, the same principle applies.
During the first five years of this child's life, when S.R.D. should have been building a relationship with his daughter, he was building a relationship with alcohol and drugs. S.R.D. was not available to give his daughter love and support. Fortunately for C.E.D., before and after her father began trying to "get his act together," someone came into her life who was willing and able to be a father to her. B.E.S. was and is willing to provide the love and support a young child needs. S.R.D. has simply provided too little interest too late in the life of this child.
In Anderson v. Ramer, 27,469 (La.App. 2nd Cir. 9/27/95), 661 So.2d 584, the court considered the fact that the stepfather enjoyed a good relationship with the child and that the natural father did not have a meaningful relationship with the child in finding it was in the child's best interest to be adopted by the stepfather. Moreover, in Anderson as in the instant case, therapy was needed in order to establish a meaningful relationship between the child and the natural father.
*1003 Accordingly, for the reasons stated, the judgment is affirmed.
AFFIRMED.
CANNELLA, J., dissents with reasons.
CANNELLA, Judge, dissenting with reasons.
I respectfully disagree with the majority that this is a case where the father's consent to the adoption is not required. While it is true that the father failed to pay child support for a sixteen month period, he thereafter obtained employment, petitioned the court for a reduction in his child support obligation, requested visitation rights and commenced paying child support of $150 per month. This was all done 8 months before the petition for adoption was filed and, was pursuant to a consent judgment agreed to and signed by the mother of the child. Further, the trial court admitted that the father has done what was recommended in pursuing his right to visitation, namely, attending AA meetings, parenting classes and counseling. The granting of an adoption without the consent of the natural father is an extreme procedure to both him and the child and should be allowed only in cases where his continuing conduct has clearly cut off his right to object. That has not happened here. Accordingly, I dissent from the majority opinion affirming the juvenile court judgment which granted the adoption.
NOTES
[1] La.Ch.C.art. 1245 was added by Acts 1991, No. 235, § 12, effective January 1, 1992. The grounds set forth in article 1245 were formerly in La.R.S.9:422.1. These grounds have not changed.
[2] Appellant argues the case of Knapp v. Adoption of Cotten, 577 So.2d 241 (La.App. 1st Cir.1991), writ denied, 580 So.2d 364 (La.1991) is factually similar. In Knapp the court set aside a stepparent adoption finding manifest error in the trial judge's concluding the adoption was in the child's best interest. That case is distinguishable since we find no manifest error in the trial judge's conclusions herein.