CHH

# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2023 CJ 1352

## STATE OF LOUISIANA
## IN THE INTEREST OF E.B.

Judgment Rendered: __APR 1 9 2024__

Appealed from the
Juvenile Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket No. JU11387

The Honorable Adam J. Haney, Judge Presiding

| | |
|---|---|
| Hillar C. Moore III<br>District Attorney<br>Otha Nelson<br>Baton Rouge, Louisiana | Counsel for Plaintiff/Appellee,<br>State of Louisiana |
| Eric Malveau<br>New Orleans, Louisiana | Counsel for Defendant/Appellant,<br>J.C. |
| Harry Landry<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellee,<br>E.B. |
| Suzanne Ecuyer Bayle<br>Bernadette Lee<br>Sheila Willis<br>New Orleans, Louisiana | Counsel for Defendants/Appellees,<br>M.B. and J.L. |

### BEFORE: McCLENDON, HESTER, AND MILLER, JJ.

McClendon, J. concurs.

**MILLER, J.**

This matter is before us on appeal by J.C., the biological father of the minor child, E.B., from a Final Decree of Adoption rendered pursuant to a petition for intrafamily adoption by E.B.'s stepfather, J.L. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

E.B. was born on February 24, 2010, from the union of her mother, M.B., and J.C., who neither married nor resided together.[1] Following E.B.'s birth, M.B. and E.B. lived with M.B.'s parents and J.C. lived with his mother in Colorado.[2] Whenever J.C. requested a visit with E.B., M.B. would schedule a visit in a public place, such as a park or mall, and would accompany E.B. While in Colorado, J.C. visited E.B. about once a week. In 2013, M.B. was accepted into law school in Utah where she and E.B. resided until 2016. After graduating, M.B. returned to Colorado to complete a one-year, post-graduate fellowship. M.B. then accepted a federal clerkship position in North Dakota, where she and E.B. resided from 2017 to 2020. In 2017, M.B. met J.L. in North Dakota and they began dating. While E.B. resided in Utah and North Dakota, J.C. would visit about once a quarter.

During a visit in December of 2019 at a mall, J.C. was attempting to take a picture with E.B., his mother, and sister who were present for the visit, but E.B. did not want her photograph taken.[3] M.B. intervened and told J.C. that E.B. did not want to take the picture, which led to a "heated exchange." During the argument, E.B. got upset and scared, began to cry, and ran off to hide. Since that incident, E.B. has refused to speak to or visit with J.C.

---

[1] We will use the initials of the parties involved in this matter instead of their names to protect their identity pursuant to Uniform Rules–Courts of Appeal, Rules 5-1 and 5-2.

[2] J.C. testified that he lived in Colorado most of his life except from November of 2010 to June of 2011 when he lived in Utah.

[3] J.L. and his son were also present for the visit.

M.B. and J.L. married on October 10, 2020. About that time, J.C. retained attorneys in North Dakota to seek custody of E.B. However, in January of 2021, M.B., E.B., and J.L. moved to New Orleans where M.B. had accepted a position in the Office of the Louisiana Attorney General. M.B. was not served with J.C.'s petition dated February 18, 2021, in North Dakota before relocating to New Orleans. In March of 2021, M.B. called J.C. to inform him that they had moved to New Orleans. J.C. then retained counsel in New Orleans and filed a petition for custody in Orleans Parish on June 8, 2021. After working in New Orleans for about six months, M.B. was transferred to the Attorney General's Office in Baton Rouge, where M.B., E.B., and J.L. reside.

On September 15, 2022, J.L., joined by M.B.,[4] filed a petition for intrafamily adoption of his stepdaughter, E.B., in the East Baton Rouge Parish Juvenile Court. J.L. and M.B. alleged therein that J.C. has "failed to visit, communicate, or attempt to communicate" with E.B. since December of 2019, a period in excess of two and one-half years, and thus, the parental consent of J.C. was not required, pursuant to La. Ch.C. art. 1245(C)(2).[5] On November 22, 2022, J.C. filed an answer and opposition to the intrafamily adoption contending that he opposed the adoption and pointing out that his pending custody case in Orleans Parish was filed before the petition for adoption.

The matter was tried before the juvenile court on May 12, 2023. At the conclusion of the hearing, the court ordered the parties to submit post-trial briefs. On July 12, 2023, the juvenile court issued written reasons for judgment finding that J.C. did not have just cause for failing to visit or communicate with E.B. and

---

[4]The parent of a child born outside of marriage who is married to the petitioning spouse shall join in the petition. La. Ch.C. art. 1244(C).

[5]Louisiana Children's Code articles 1245(A) & (C)(2) provide that when the spouse of a stepparent petitioner is exercising lawful custody of the child and it is proven by clear and convincing evidence that the other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months, the requirement that the other parent consent to the adoption is dispensed with.

that the intrafamily adoption was in the best interest of E.B. such that J.C.'s consent was not required. The juvenile court thus granted the petition for intrafamily adoption. A judgment entitled, "Final Decree of Adoption," was signed on July 20, 2023. J.C. filed the instant suspensive appeal contending that the juvenile court erred in: (1) finding no just cause for J.C.'s failure to contact E.B.; (2) proceeding with the adoption while the custody matter was pending; and (3) finding that the adoption was in E.B.'s best interest.[6]

## DISCUSSION

### Assignment of Error Number One

In his first assignment of error, J.C. contends that the trial court erred in finding that his failure to contact E.B. was without just cause, such that his consent to this adoption was not required.

The intrafamily adoption, which refers to adoption by a stepparent or certain other relatives of the child, is authorized by Louisiana Children's Code articles 1170 and 1243, *et seq.* Generally, a parent's consent is required for an intrafamily adoption. La. Ch.C. art. 1193.[7] However, as noted herein, pursuant to La. Ch.C. art. 1245, consent of a parent is not necessary if the petitioner proves that the parent has forfeited his right to consent under the following conditions:

---

[6]In his motion for suspensive appeal filed on July 25, 2023, J.C. appeals from the July 12, 2023 written reasons for judgment granting the petition for intrafamily adoption. Although the Final Decree of Adoption was signed on July 20, 2023, notice of this final judgment was not issued until July 26, 2023. To the extent that J.C.'s motion for appeal may seem premature, we note that once the final judgment has been signed, any previously existing defect has been cured, and there is no useful purpose in dismissing an otherwise valid appeal. See Overmier v. Traylor, 475 So. 2d 1094, 1094-1095 (La. 1985) (per curiam); City of Denham Springs v. Perkins, 2008-1937 (La. App. 1st Cir. 3/27/09), 10 So. 3d 311, 317, n.5, writ denied, 2009-0871 (La. 5/13/09), 8 So. 3d 568. Thus, this appeal is properly before us.

[7]Louisiana Children's Code article 1193 provides that unless rights have been terminated or relinquished, consent to the adoption is required by the father of the child, regardless of the child's paternity, *if the father is presumed to be the father of the child* in accordance with the Louisiana Civil Code or its legal equivalent in another state. La. Ch.C. art. 1193(2)(b). We need not decide at this point whether J.C.'s paternity is presumed under law. If we assume that J.C. created a presumption of paternity as contemplated by La. Ch.C. art. 1193(2)(b), the petitioners may still employ La. Ch.C. art 1245 to prove that J.C. forfeited his right to consent. If petitioners show that J.C. forfeited his right to consent, the question as to whether his consent was required in the first place is no longer at issue.

4

A. The consent of the parent as required by Article 1193 may be dispensed with upon proof by clear and convincing evidence of the required elements of either Paragraph B[8] or C of this Article at the hearing on the opposition and petition.

\* \* \*

C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists:

(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.[9]

(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.

The party petitioning the court for adoption carries the burden of proving a parent's consent is not required under the law. In re J.A.B., 2004-1160 (La. App. 1st Cir. 9/17/04), 884 So. 2d 678, 681, writ denied, 2004-2963 (La. 12/14/04), 888 So. 2d 848. Although the initial burden of proving that a parent's consent to an adoption is not required lies with the party seeking the adoption, once a prima facie case is proven, the burden shifts to the nonconsenting parent to establish "just cause" for their failure or show that his or her failure was due to factors beyond his or her control. See In re C.L.A.C., 2017-1703 (La. App. 1st Cir. 10/24/18), 266 So. 3d 302, 306. "Just cause" for a parent's failure to support, visit, or communicate with his children must be due to factors beyond his control. In re B.L.M., 2013-0448 (La. App. 1st Cir. 11/1/13), 136 So. 3d 5, 9.

In the instant case, J.L. and M.B. alleged that J.C.'s consent was not required pursuant to La. Ch.C. art. 1245(C)(2) because he failed to visit, communicate, or attempt to communicate with E.B. without just cause for at least six months. At trial, J.C. conceded that the last time he attempted to communicate with M.B. was

_____

[8]Section B of Article 1245 pertains to when a petitioner has been granted a court order of custody and is thus inapplicable herein.

[9]J.C. and M.B. do not dispute that J.C. did not provide support and that neither of them sought a court order of support.

5

in 2020 and that he did not call her in 2021 or in 2022 to set up a visit. Thus, J.C. does not dispute that he has not visited or communicated with E.B. for more than six months. However, J.C. argues that his failure to do so was with "just cause" because when he made attempts to contact the child, M.B. told him that E.B. wanted no contact. J.C. contends that when his attempts to contact E.B. *via* phone calls were unsuccessful and M.B. indicated that E.B. did not wish to see him, his only recourse was to request court intervention, which he did in North Dakota and New Orleans. J.C. averred in brief that "retaining counsel and filing petitions for custody shows that he wanted to have a relationship with the minor child."

While we recognize that J.C. attempted to seek custody in North Dakota and New Orleans before the petition for intrafamily adoption was filed, this court has held that a parent's filing of a rule for visitation, where there is no ongoing litigation, does not serve to interrupt the six-month time period or otherwise negate application of the requirements of La. Ch.C. art. 1245. See In re A.M.B., 2006-1114 (La. App. 1st Cir. 12/28/06), 2006 WL 3813728, *5-7 (unpublished) (where the nonconsenting parent filed a rule to regain visitation one month before the stepparent filed a petition for intrafamily adoption, and prior to that time, he did not seek legal assistance to obtain visitation, this court applied La. Ch.C. art. 1245 and affirmed the granting of the petition for intrafamily adoption); see also In re Intra Family Adoption of A.G.T., 2006-0805 (La. App. 5th Cir. 3/13/07), 956 So. 2d 641, 648-649, writ denied, 2007-0783 (La. 5/4/07), 956 So. 2d 611 and In re C.E.M., III, 2009-787 (La. App. 5th Cir. 1/26/10), 31 So. 3d 1138, 1143 (the mere filing of a rule for custody and visitation does not interrupt the six-month time period set forth in La. Ch. C. art. 1245(C)(2) where the nonconsenting parent could have contacted or visited with his child but failed to do so without just cause); see also In re B.L.M., 136 So. 3d at 9 (the mere filing of a petition to annul a consent judgment was insufficient to interrupt the six-month time period set forth in La.

6

Ch.C. art. 1245(C)(2)); In re C.L.A.C., 266 So. 3d at 307-308 (where the nonconsenting parent did not file a motion to enforce custody until almost three years after the initial custody judgment and over two and a half years since she had last exercised custody pursuant to that judgment, there was no "on-going" custody litigation to prevent the application of La. Ch. C. art. 1245); cf. In re R.P.D., 2014-1539 (La. App. 1st Cir. 4/22/15) 2015 WL 1880489, *2 (unpublished) (where nothing was filed or heard in the custody case for over four years and the nonconsenting parent had not exercised custody or visitation in over four years, the parties were not involved in "on-going" custody litigation that would prevent the stepparent from filing for intrafamily adoption).

Moreover, although J.C. argues that M.B. and J.L. have "actively hindered" him from communicating with E.B., he put forth no evidence to support this allegation. In contrast, M.B. and J.L. presented testimony specifically denying any such allegations. M.B. acknowledged that she supervised all visits with E.B., but stated she did so because she was concerned for E.B.'s safety. M.B. stated that she was sexually assaulted by J.C. twice when they were dating, that J.C. had an "explosive temper," and she was fearful something would happen if he was left alone with E.B. Further, while J.C. argues that M.B. did not provide him with her home address, he conceded that he always had her phone number and email address. J.C. testified that he would like to take E.B. to private therapy with a counselor who specializes in parental alienation, but there was no point in contacting a therapist to initiate contact because M.B. and E.B. would not permit that and "past experiences would only lead him to believe that those efforts would have also been thwarted and summarily ignored." M.B. testified that J.C mentioned counseling in 2020 when they were still in North Dakota, but he did not ask to bring E.B. to a counselor. J.C. testified that from December of 2019, until October of 2020, he was "waiting and seeing if the situation would get better."

7

J.C. conceded that he has not done anything to repair his relationship with E.B., but contends he needs physical access to his daughter to be able to do so. However, J.C. testified that he did not speak to M.B. after February of 2020. J.C. testified that he did not send gifts or cards to E.B. because E.B. "wasn't very appreciative" and he had no way of knowing if they were received.

At the trial of this matter, the juvenile court heard the testimony of J.C., M.B., J.L., and conducted an examination of E.B. In its written reasons, the court addressed J.C.'s failure to contact E.B., and whether E.B.'s reluctance or refusal to visit with J.C. constituted just cause for his failure, as follows:

> The question before the Court is whether [J.C.'s] filing for custody in North Dakota constitutes an attempt to contact the child, and whether or not the child's requests for no contact constitute just cause for [J.C.'s] failure to contact her. The appellate courts have clearly stated that simply filing for visitation and/or custody does not, by itself, constitute an attempt to contact the child. It is clear from the testimony in this matter that [M.B.] had historically allowed contact between [J.C.] and his daughter. Furthermore, [M.B.] was not hiding from [J.C.]. While he may not have known her address, he clearly knew where she was and where she worked. He could have easily had contact with her to arrange visitation.
>
> The second question to be answered is whether [or] not the child's unwillingness to see her father constitutes just cause for failure to contact. The Court respects that [J.C.] appears to have complied with his child's wishes by not pushing contact with her during the period after the fight between him and her mother. However, the case law is clear that it is the parent's responsibility to attempt to contact or have some type of relationship with the child during the prescribed period. A six-month period went by without letters, gifts, texts, phone calls or any other direct attempt at contact. The child is not required to respond. The entire burden is on the parent to attempt contact. [J.C.] did not make any attempts until he filed for custody, and then once it was filed he made no other attempts to have contact with the child, either directly or through therapeutic means.
>
> . . .
>
> [M]erely the child refusing to see a parent is not enough to amount to just cause … [I]n this case, [J.C.'s] only attempted further contact was his filing in family court. … [T]he case law is clear that just a filing with no further attempts at communication with the child does not amount to just cause in the failure to communicate. Thus, this court could not find just cause here.

After a thorough review of the record and testimony herein, we find no error in the juvenile court's determination that J.C. failed to establish just cause for his

failure to visit, communicate, or attempt to visit E.B. By his own admission, J.C. made no "attempts" to communicate or visit E.B. since February of 2020 when he had M.B.'s phone number and email address and could have easily done so.

## Assignment of Error Number Two

In his second assignment of error, J.C. contends that the trial court erred in proceeding with the adoption while the custody matter was pending, arguing that the "custody matter should have stopped the adoption" from proceeding. On the record before us, however, we are unable to find where J.C. requested a stay or continuance in this matter in order to allow the pending custody matter to proceed. We are unaware of any authority, and J.C. has provided none, which would establish that the mere filing of a petition for custody serves as a bar to an adoption proceeding.

The record does reveal that during his examination by M.B.'s attorney, J.C. testified that there was a hearing in the Orleans Parish custody proceeding, but that the Orleans Parish court was reluctant to rule on the custody issue until the outcome of the adoption petition was settled. Counsel for J.C. objected to this questioning on the basis that it called for a legal conclusion and advised the court that motions were filed in that proceeding that have not been served because of the pending adoption. In connection with this testimony, counsel for M.B. introduced the petition filed in the Orleans Parish custody proceeding.

In the absence of any attempts by J.C. to stay or continue the instant matter until the custody matter was resolved, we find no merit to this assignment of error.

## Assignment of Error Number Three

In his third assignment of error, J.C. contends that the juvenile court erred in finding that adoption was in the best interest of E.B. J.C. contends that he has had limited contact with E.B. because of M.B.'s interference. J.C. further contends that M.B. has inserted herself into every interaction with E.B. because of false

9

allegations of sexual assault, which he contends she did not levy against him until he asserted his rights to petition for custody of E.B. J.C. contends that M.B. failed to "make any attempts to repair the relationship between father and daughter," or foster "a relationship between father and daughter."

Even where a parent's consent is obviated by failure to visit, the court must also consider what is in the best interest of the child in determining whether the adoption should proceed. In re J.A.B., 884 So. 2d at 683. In fact, the primary consideration in adoption proceedings is whether the adoption is in the best interest of the child. In re B.L.M., 136 So. 3d at 11.

> Louisiana Children's Code article 1255(B) provides that:
>
> The court, after hearing and after taking into consideration information from all sources concerning the intrafamily adoption, may enter a final decree of adoption, or it may deny the adoption. The basic consideration shall be the best interests of the child.

Whether an adoption is in a child's best interests must be decided on the unique facts of each case, and the trial judge is vested with great discretion in making that determination. Knapp v. Adoption of Cotten, 577 So. 2d 241, 247 (La. App. 1st Cir.), writ denied, 580 So. 2d 364 (La. 1991). Because the trial judge is in a better position to make the best interest determination, an appellate court will ordinarily not second-guess such sensitive decisions. However, the trial judge's discretion is not absolute, as the court's decision is subject to reversal if found to be manifestly erroneous or clearly wrong.[10] In re A.M.B., 2006 WL 3813728 at *3 (unpublished).

---

[10]A court of appeal may not set aside a district court's finding of fact in the absence of manifest error or unless it is clearly wrong. To reverse a factfinder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Stobart v. State through Department of Transportation and Development, 617 So. 2d 880, 882 (La. 1993). When factual findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard of review demands great deference to the trier of fact's findings, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So. 2d 840, 844 (La. 1989).

In intrafamily adoption cases, this court has held that several factors must be considered when determining the best interest of the child. See In re C.E.F., 2007-0992 (La. App. 1st Cir. 9/14/07), 977 So. 2d 1, 6; In re Miller, 95-1051, 95-1052 (La. App. 1st Cir. 12/15/95), 665 So. 2d 774, 777, writ denied, 667 So. 2d 541 (La. 1996). The most important factors are the child's relationship with the petitioning stepparent and the natural parent not married to that stepparent. It is not enough to examine the love and home environment provided by the petitioner/stepparent. The court must also examine the depth of closeness of the child's ties with the noncustodial natural parent, and the effect that the loss of this relationship would have on the child. Further, the court must consider the seriousness and finality of severing the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent. In re C.L.A.C., 266 So. 3d at 308-309.

J.L. testified that he considers himself to be E.B.'s father and she calls him "dad." J.L. testified that E.B. has already integrated him in her life as her father, looks up to him as the one who takes care of her, and introduces him to her friends as her dad. According to J.L., he had custody of his three children who considered E.B. their little sister. Although his daughter passed away in a car accident a year ago, E.B. is excited to have two big brothers and she has bonded really well with his youngest son. J.L. testified that he gets along really well with E.B. and drives her to school every day in New Orleans and back to Baton Rouge so she can finish out the school year at her current school. J.L. drives her to her extra-curricular activities and sports. J.L. testified that he asked E.B. if she wanted him to adopt her and she told him, "[n]o need, because you're already my dad." He provides for the family financially, contributes to E.B.'s school and extra-curricular expenses, and provides health, dental, and vision insurance. J.L. testified that E.B. told him she does not want to see J.C. and that she is fearful of him. J.L. stated that it is up

11

to E.B. if she wants to have a relationship with J.C. and that he does not encourage or discourage E.B. from having a relationship with J.C.

M.B. testified that she has never denied J.C. a visit with E.B. when he requested one. However, M.B. testified that she has always supervised visits with E.B. and J.C. because she was afraid of E.B.'s safety because J.C. had sexually assaulted her twice before when they were dating and has an "explosive temper." M.B. stated that was the reason she never provided J.C. with her home address. M.B. stated that before the mall incident, E.B. was not afraid of J.C, but she was uncomfortable during the visits. M.B. described an incident at a child's birthday party when E.B. was four or five years old, where E.B. lost some stickers J.C. had given her. J.C. got very angry and yelled at E.B. for having lost them and told E.B. that she had "thrown away his love." M.B has had several conversations with E.B. about talking to J.C., and E.B. was very clear that she was afraid of J.C. and did not want to talk to him or see him ever again. M.B. denied speaking negatively about J.C. to E.B. and has never told E.B. not to speak to J.C. M.B. did not report the sexual assault until she found out that J.C. was seeking custody of E.B. in North Dakota because she felt she had no other choice. Prior to that she had been very careful to keep it out of the public record because she was afraid of the emotional damage it might cause for E.B. J.C. did not ask for a visit after December of 2019. M.B. testified that he called and asked to speak to E.B. but she did not want to talk to him. M.B. stated that E.B. asked her who her father was when she was around ten years old, M.B. told her J.C., and E.B. was shocked. E.B. never called J.C. dad.

E.B. testified that her dad is J.L. and her biological father is J.C. E.B. stated that she is happy to be adopted by J.L. because she does not want J.C. to be her father. E.B. testified that she does not trust J.C. E.B. recalled the incident at the mall, stating that J.C. started yelling at her mom and it really scared her. E.B.

testified she does not like taking pictures because J.C. would ask for a picture every time they visited, and it made her feel really uncomfortable. She stated that J.L. adopting her is not going to change anything in her family. Instead, she stated "[i]t's just going to be legal." She testified that J.C. called three times after the "mall stuff" and she told her mom she did not want to talk to him. J.C. sent her a gift and she got rid of it because she did not want it and did not want to open it. E.B. testified that she did not think there would ever be a point in her life where she would ever want to talk to J.C. because he has never been a permanent figure in her life. She stated she did not know he was her biological father until she was eight years old. E.B. testified that if she had to see him she would hide in a corner, and if she was ordered to go to a counselor, she would hide in the bathroom. E.B. testified that she does not want to ever see J.C. again and that her mom and dad have never encouraged her not to see him. She testified that they tell her that she does not have to see J.C. "if [she] don't want to."

In finding that adoption was in the best interest of E.B., the juvenile court determined:

> The court had an opportunity to speak with the child, and it is clear from her testimony that at the current age of thirteen, that she is happy, healthy and well-adjusted in her current position and that this adoption is what she wants. She clearly has more of a parental relationship with [J.L.] than with [J.C.]. Through the totality of the other testimony heard it is clear that this intrafamily adoption is in the best interest of the minor child[.]

After thoroughly reviewing the record and testimony herein and examining the factors set forth above, we find no abuse of discretion or manifest error in the juvenile court's determination that the intrafamily adoption of E.B. is in her best interest. Accordingly, we find no merit to this assignment of error on appeal.

## CONCLUSION

Based on the above and foregoing assigned reasons, the Final Decree of Adoption judgment is affirmed. Costs of this appeal are assessed to the appellant, J.C.

**AFFIRMED.**