MOLAISON, J.
*965 In this intrafamily adoption case, the biological mother, K.L., appeals the judgment of the juvenile court which found that her consent was not required for the adoption of E.B. by the child's stepmother, terminated K.L.'s parental rights, and granted the petition for intrafamily adoption. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
This matter comes before us for the second time, after we dismissed appellant's first appeal for lack of jurisdiction. In re L. D. B. , 17-373 (La. App. 5 Cir. 10/4/17), 228 So.3d 296. In K.L.'s prior appeal, we detailed the relevant underlying facts and procedural history of the proceedings as follows:
Appellant, K.L., and C.B., who were never married, had a child, E.B., together on July 1, 2005. The parties parted ways in 2009, when E.B. was four years old. From 2009 until 2014, the parties shared joint custody of E.B., with K.L. as the domiciliary parent and C.B. having visitation every other weekend and holidays. In 2014, after an apparent contentious custody battle, C.B. became the domiciliary parent and K.L. had visitation.
After separating from K.L., C.B. married L.B. in September 2009. On February 24, 2017, L.B. and C.B. filed a petition for intrafamily adoption in Juvenile Court for the Parish of Jefferson, wherein L.B. sought to adopt E.B. The parties alleged that E.B.'s biological mother, K.L., who had not consented to the adoption and whose parental rights had not been terminated, had failed to visit or attempt to communicate with E.B. for a period of ten months and had failed to pay court ordered child support for more than one year. As such, the parties asserted that K.L.'s consent was not required for the adoption. The parties further averred it was in E.B.'s best interest that she be adopted by L.B.
K.L. filed an opposition to the petition for intrafamily adoption, claiming that C.B. and L.B. had denied her contact with E.B. despite her repeated attempts since August 2015. K.L. admitted that she had been in arrears for her child support obligation, but asserted that she had made payments and continues to make efforts to reduce her arrearages and meet her obligation. K.L. alleged the petition for adoption was an abuse of process in the ongoing custody dispute in the 24th Judicial District Court ("24th JDC").
The juvenile court conducted a hearing on the opposition to the adoption on May 8, 2017. At the hearing, C.B. and L.B. testified in support of their petition and introduced evidence consisting of various emails between C.B. and K.L.; a visitation calendar kept by C.B.; documentation regarding K.L.'s child support obligation and arrears; a police report showing a child custody disturbance on February 10, 2017 at which time K.L. was arrested on an outstanding attachment; a Valentine's Day card and Mother's Day card given to L.B. by E.B.; and a letter from E.B.'s court appointed attorney indicating that K.L. was not agreeable to meet to discuss school holiday visitation. Additionally, the court examined *966 E.B. in chambers in the presence of counsel.
To oppose the petition, K.L. offered her own testimony along with the testimony of her mother, a friend, L.B.'s brother and sister-in-law, and L.B.'s ex-husband. K.L. also introduced into evidence more emails between herself and C.B., photographs showing her house and E.B.'s room at her house, as well as photographs of E.B. with K.L. and family, and a letter from Kerry Nesbit with Behavioral Health Solutions of Louisiana indicating that K.L. had been diagnosed with post-traumatic stress disorder, major depressive disorder and borderline personality disorder and had been treating at the clinic since August 6, 2016.
The juvenile court rendered judgment at the conclusion of the hearing, which was reduced to writing the same day, denying K.L.'s opposition to the petition for intrafamily adoption, specifically finding that C.B. and L.B. proved by clear and convincing evidence that K.L. had failed to support and visit her child for a period in excess of six months and that her consent was not required for the adoption to proceed. In explaining its ruling, the court stated that it had reviewed the 24th JDC child custody record, noting that it was "two large volumes and a third not-so-large volume." The court extensively referred to an evaluation that was conducted in September 2013 in the child custody case in which E.B.'s therapist reported certain concerns. In ruling from the bench, the court explicitly stated that it was in E.B.'s best interest for the adoption to go forward; however, the court did not render a final decree granting or denying the petition for adoption. Instead, the court explained:
It is my policy to wait the time limit to see if this decision will be appealed before I actually go forward with the final degree [sic] of adoption, and I am going to do that in this case. I will set a tentative date for the adoption hearings in approximately 30 days.
Thereafter, K.L. filed a motion for a suspensive appeal from the May 8, 2017 judgment "decreeing the adoption of E.J.B. in favor of [L.B.]," which the juvenile court granted.
Id. at 297-298.[1]
The record shows that, subsequent to this Court's dismissal of the first appeal, the parties appeared in juvenile court on December 4, 2017, for a hearing on L.B.'s petition for intrafamily adoption, which the judge granted on that same date. On December 14, 2017, the court issued a final written judgment which legally recognized L.B. as the adoptive mother of E.B. and formally terminated K.L.'s parental rights. K.L. thereafter timely filed a motion for appeal, which was granted.
LAW AND ANALYSIS
In her two assignments of error, K.L. argues summarily that the trial court erred in granting E.B.'s adoption upon finding that K.L.'s parental consent was not necessary.
Parental Consent
With respect to the issue of parental consent, K.L. specifically asserts that the trial court erred in holding that a time period lasting over six-months, during which K.L. did not visit E.B. or provide financial support, was not justified by K.L.'s "severe mental condition." The significance of the time period pertains to La.
*967 Ch.C.art. 1245, which addresses the requirement of parental consent for intrafamily adoptions. That article provides, in part:
A. The consent of the parent as required by Article 1193 may be dispensed with upon proof by clear and convincing evidence of the required elements of either Paragraph B or C of this Article at the hearing on the opposition and petition.
C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists:
(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.
(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.
Only one of the conditions of La. Ch.C.art. 1245(C) needs to be proven to dispense with the consent of a parent to an intrafamily adoption. In re B.E.M. , 07-94, p. 10 (La. App. 5 Cir. 5/29/07), 961 So.2d 498, 503.
At the May 8, 2017 hearing on K.L.'s opposition to adoption, the trial court was presented with the following testimony relevant to the issue of visitation of E.B. by K.L:
C.B. testified that he and K.L had joint custody of E.B. since 2014. He said that from September of 2015 through November of 2016, there was no attempt by K.L to exercise her custody or communicate with E.B. C.B. was unsuccessful in attempting to communicate with K.L. about finding out her intentions of picking up E.B. for visitation on weekends and after school on some afternoons. Emails and calls to K.L. went unanswered until November of 2016, when K.L called and asked to pick up E.B. on the day of L.B.'s brother's funeral. C.B. stated that K.L.'s parents still requested visits with E.B. C.B. understood from E.B. that in November of 2016 and January of 2017, E.B.'s grandmother picked E.B. up for church and lunch and then went to K.L.'s home to visit.
K.L.'s mother, S.L., testified that she had seen E.B. five times since the end of 2015. When she had E.B., S.L. called K.L., who attended each of those visits at S.L.'s home. S.L. stated that she thought that all of those visits were in 2015, but she was not certain. Every time that S.L. brought E.B. to her home, it was at K.L.'s request. S.L. did not recall that K.L. had hit S.L., or that K.L. had been arrested for domestic abuse for hitting her son.
K.L. entered a faxed letter into evidence from her counselor, Kerry Nesbit,[2] which read:
"Our patient, [K.L.], date of birth, 8/12/1970, has requested the details regarding her treatment be submitted to you before her next hearing. [K.L.] has been diagnosed with posttraumatic stress disorder, unspecified type, major depressive disorder, recurrent moderate and borderline personality disorder. The patient began receiving services beginning 8/6/2016 and continues to receive psychotherapy on a weekly basis and medication management every three months from this clinic. She is compliant with all therapy appointments."
In connection with the introduction of the letter into evidence, counsel for K.L.
*968 argued that K.L.'s "mental illness" was the cause for the noncompliance with child support payments as well as the "sporadic visitations with physical custody."
In its Reasons For Judgment, issued on June 7, 2017, the trial court summarized its findings on the visitation issue as follows:
The last time K.L. exercised her visitation with E.J.B.[3] was from July to August of 2015. S.L., E.J.B.'s maternal grandmother, had visitation with E.J.B. approximately five times since the end of 2015. During S.L.'s visitation with E.J.B., S.L. would call K.L. to let her know that E.J.B. was at her house. K.L. would then go to S.L.'s house and visit with E.J.B. during those times.
K.L. has asserted that by having contact with E.J.B. at her parents' home, that counted as visitation; however, it does not. S.L. (E.J.B.'s maternal grandmother) would call C.B. Jr. for visits and S.L. was granted visits. Every time S.L. would ask for a visit, C.B. Jr. arranged for the visit. C.B. Jr. and L.B. are under no legal obligation to allow visitation between S.L. and E.J.B., yet they accommodated the request every time as being in the best interest of E.J.B. due to E.J.B.'s love and affection for the grandparents. There were at least five visitations between the grandmother S.L. and E.J.B. by everyone's account in which K.L. came to see E.J.B. That does not constitute K.L. exercising her visitation rights. The mother, K.L. is the one obligated to exercise her visitation rights, not the grandmother. Both C.B. Jr. and L.B. knew that K.L. would go see E.J.B. during her visits with the grandmother and C.B. Jr. and L.B. still allowed E.J.B. to go on the visits. This further proves that C.B. Jr. and L.B. did not attempt to thwart K.L. from seeking any visitation she may have wished to have had with E.J.B.
At the December 4, 2017 hearing, C.B. testified that K.L. stopped exercising her visitation rights in 2015, and also stopped making child support payments at approximately the same time. During questioning by the trial judge, C.B. clarified that on October 26, 2015, counsel for K.L. notified E.B.'s appointed counsel that K.L. had decided not to pursue custody or visitation.[4] The first visit that K.L. had with E.B. after that was in the fall of 2017. There were no attempts by K.L. to see E.B. after October of 2015 until February of 2017. Further, C.B. testified that no child support was paid by K.L. through the summer of 2017.
E.B. testified at the hearing that she previously had not seen her mother for a period of two years.
K.L. testified on cross examination that she did not make an effort to see E.B. for over a year because she was "sick" and a "shut in."
At the conclusion of the hearing, the trial court stated:
THE COURT:
...
At this time, let's be clear. First of all, this Court, as everyone is aware, [this Court] had a previous hearing on May -- let me find the minute entry -- May the 8th, was it? Yes. -- was the opposition hearing where this Court determined after *969 that hearing that the consent of [K.L.] was not required in that she had legally abandoned her child by not having any contact with her for a period in excess of six months and not providing any support to her for a period in excess of six months without just cause to do so.
Out of an abundance of caution, because of some of the concerns that the Fifth Circuit had in Ms. Sandhu's attempt to appeal that decision, which was ultimately dismissed by the Fifth Circuit, the Court did allow [K.L.] to come back into this hearing today and, essentially, gave her a second opportunity to show that she, perhaps, had made efforts to visit her child or support her child but that those efforts had been thwarted.
Nothing that has been presented to me today has convinced this Court that that is true. [K.L.] went for a period well in excess of six months. In fact, well in excess of a year to two years without having any meaningful contact with her child. There has been nothing presented to this Court today to suggest that there was a valid or legal reason for her to do so, nor do I believe that she was thwarted in any way by either [L.B.] or [C.B.] in her attempts.
The affirmative defense of "just cause"
With respect to child support, once it is shown that a parent did not comply with the court order of support, the burden shifts to the parent to prove by a preponderance of the evidence that he or she had "just cause" for the failure to support the child. State in the Interest of M.L. and P.L. , 95-0045, p. 9 (La. 9/5/95), 660 So.2d 830, 833. Just cause is an affirmative defense and the parent bears the burden of proving that he/she had just cause for not paying child support or that the failure to pay child support resulted from circumstances out of his/her control. In re Sevin , 97-1145, p. 2 (La. App. 5 Cir. 5/13/98), 712 So.2d 998, 999. Similarly, regarding a parent's failure to visit or communicate with his/her child, a finding of "just cause," must be due to factors beyond his/her control. In re Morris , 39,523, p. 8 (La. App. 2 Cir. 1/26/05), 892 So.2d 739, 743.
On appeal, K.L. does not challenge the trial court's finding that a period of over six months passed without K.L. visiting E.B. or providing financial support. Rather, K.L. argues that both her lack of visitation and child support occurred as a result of mental illness, a factor which she contends constitutes "just cause" under La. Ch.C.art. 1245.
In Steed v. McKenzie , 344 So.2d 689 (La. App. 1st Cir. 1977), the First Circuit considered the issue of whether a father's consent to the proposed adoption was necessary when he had failed to make child support payments for over six months. On appeal, the court found that the father had demonstrated that just cause existed for failing to make the child support payments where there was ample evidence of the father's long history of mental illness, which included being committed to various mental institutions, as well as reports from treating psychiatrists and psychiatric social workers which concluded that the father could not "work, attend school or function as a normal person." Id. at 692. In light of that evidence, the court found that the "record as a whole convinces us that Appellee has not shown a calculated, intentional disregard for the welfare of his children." Id. at 693. Accordingly, the First Circuit found no error on the part of the trial court for denying the petition for adoption without the natural father's consent.
*970 Conversely, in a case relied upon by K.L, Leger v. Coccaro, 98-202 (La. App. 3 Cir. 4/29/98), 714 So.2d 770, writ denied , 724 So.2d 740 (La. 07/2/98), the appellant, the natural father, argued that his failure to pay child support was excused by the just cause of his depression. On appeal, however, the Third Circuit found that the trial court did not err in finding that the appellant's depression did not constitute just cause when "[t]he medical evidence regarding Coccaro's illness is sparse and not supported by testimony or deposition." Id. at 772.[5]
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Through DOTD , 617 So.2d 880 (La. 1993). A two-tiered test for reversal of a fact finder's determination has been established by the Louisiana Supreme Court: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong. Id. at 882, citing Mart v. Hill , 505 So.2d 1120, 1127 (La. 1987).
In the instant case, at the hearing on May 8, 2017, K.L. introduced into evidence a faxed copy of a letter from her therapist's office which referenced K.L.'s diagnoses of posttraumatic stress disorder, major depressive disorder, and recurrent moderate and borderline personality disorder. K.L. herself testified that she was "sick" during the period that she had no contact with E.B. and did not provide financial support.[6] Here, unlike the evidence presented in Steed, supra , and similar to the facts in Leger , supra , K.L. has not demonstrated on the record the existence of a documented, prolonged, and debilitating mental illness that would have precluded her from exercising even a single visit with E.B. for well over a six month period. Accordingly, based on the record before us, we find that the trial court's conclusion that K.L.'s consent to the adoption is not required is adequately supported and is not clearly wrong.
Best interest of the child
We next consider whether the trial court properly determined that the intrafamily adoption is in E.B.'s best interest.
The primary consideration in adoption proceedings is whether the adoption is in the best interest of the child. In re B.E.M. , supra , citing In re Miller, 95-1051, p. 8 (La. App. 1 Cir. 12/15/95), 665 So.2d 774, 777, writ denied , 96-0166 (La. 2/9/96), 667 So.2d 541. The party petitioning the court for adoption carries the burden of proving the adoption is in the best interest of the child. In re J.M.P. , 528 So.2d 1002, 1012 (La. 1988). Whether an adoption is in the best interest of the child must be decided on the facts of each case, and the trial judge is vested with great discretion in making that determination. In re Farrar , 93-1347 (La. App. 3 Cir. 4/6/94), 635 So.2d 674, 676. However, this discretion is not absolute and the trial judge's best interest determination is subject *971 to reversal if the record reveals it was manifestly erroneous. Adoption of Latiolais , 384 So.2d 377 (La. 1980).
In K.L.'s first appeal, we noted several issues based upon our review of the record. We first determined that the trial court had failed to complete "the pertinent determination of the best interest of the child for purposes of the intrafamily adoption" because such a finding was not included in the written judgment itself. In re L. D. B. , 228 So.3d at 300. Next we observed that while the trial court had relied "extensively" on documentation contained in the child custody record in this matter from the Twenty-Fourth Judicial District Court, there was no indication that the record was introduced by either party into evidence. Id. This Court's evidentiary concerns observed in the prior appeal were addressed at the December 4, 2017 hearing, with the formal introduction of numerous exhibits related to the child custody proceeding. In addition, a formal finding that the adoption is in E.B.'s best interest was included in the final written judgment of December 14, 2017.
At the December 4, 2017 final decree hearing, the trial court indicated the specific factors it considered in determining E.B.'s best interest: It first considered the fact that E.B. repeatedly expressed her wishes to be adopted by L.B., even as she indicated her love for K.L. and a desire not to hurt her mother's feelings. The court then referred to numerous documented instances of "turmoil" caused in E.B.'s life by K.L.'s past behavior, including the most recent incident where K.L. drove recklessly on the interstate when pursuing L.B.'s car. The court also found that L.B. had provided E.B. with love and stability. Finally, the court stated that its best interest determination was based on the evidence adduced at the two hearings conducted in connection with E.B.'s adoption.
The court made even more specific and detailed findings in its January 9, 2018 reasons for judgment:[7]
V. It is in E.J.B.'s best interest that this adoption be granted.
The last contacts that the 24th Judicial District Court had with regards to the award of custody of E.J.B. was in March and June of 2014. (See P-14 and P-16). In March of 2014 joint custody of E.J.B. was maintained between K.L. and C.B. Jr. with C.B. Jr. named as domiciliary parent. (See P-14). The March 2014 judgment further ordered K.L. to undergo psychological counseling. (See P-14). On June 2, 2014, per judgment, K.L. was ordered supervised visitation rights. (See P-16). Prior to the change in physical custody of E.J.B. in March of 2014, there was an extensive custody evaluation that was ordered by the 24th Judicial District Court dated September 14, 2013 in which the evaluator substantiated just about everything that was presented to this Court through the testimony of C.B. Jr. and L.B. (See P-13).
There was an issue of whether or not E.J. B. had been slapped by K.L. which was denied by both K.L. and S.L. in their respective testimony. However, E.J.B.'s own therapist expressed great *972 concern to the evaluator for E.J.B.'s emotional well-being for several reasons. The therapist witnessed K.L.'s temper and retaliatory behavior toward E.J.B. for issues related to C.B. Jr. and the custody battle that has ensued between K.L. and C.B. Jr. The therapist recounted an incident where E.J.B. told her that she was having a bad day because K.L. slapped her face. When the therapist attempted to address the situation with K.L., K.L. became enraged, standing over E.J.B. and screaming at her telling her she was a "liar". This incident affected the therapist so greatly that her office telephoned the Department of Family and Children Services. In addition, the therapist stated that if C.B. Jr. gets any additional custodial time, she fears the K.L. will take it out on E.J.B. The therapist went so far as to suggest sole custody for E.J.B. with C.B. Jr. because partial custody may result in K.L: retaliating against E.J.B. E.J.B. made complaints about C.B. Jr. to the therapist, but was extremely cautious about saying anything negative about K.L., which the therapist interpreted as fear of reprisal. The therapist stated that E.J.B. has witnessed a tremendous amount of conflict between K.L. and several other people, including C.B. Jr., K.L.'s biological son, and S.L., and has witnessed K.L. getting arrested at least twice. The therapist confirmed that she was told by K.L. that K.L. would abscond with E.J.B. if custody does not go her way. The therapist further stated that she felt both parents could do a better job of keeping conflict off of E.J.B.'s radar.
In addition, the custody evaluation goes on to include information pertaining to ten police reports involving incidents dating back from October 2009 to January of 2013 for review. (See P-13). The reports were from St. John the Baptist Parish, St. Charles Parish and City of Kenner. Eight of the ten reports involve incidents that occurred during exchanges of the E.J.B. On two separate occasions K.L. had to be placed in handcuffs due to her argumentative, irate and uncooperative behavior and on two other occasions K.L. was arrested.
It is also noteworthy, that once C.B. Jr. was made the domiciliary parent things started to drastically improve for E.J.B. in her life. E.J.B.'s attitude improved, her grades improved, the encopresis and enuresis stopped, and she became a much more happy and outgoing child.
At the hearing on December 4, 2017, L.B. testified as to an incident that occurred on Interstate 10 shortly after the May 2017 hearing in Juvenile Court in which both she and E.J.B. were in one vehicle and K.L. was in another vehicle. L.B. testified that upon K.L. noticing both L.B. and E.J.B. in the vehicle K.L. started acting erratically and putting everyone in the vehicle in fear. L.B. testified that the incident scared her so much that she filed a protective order. (See P-20). E.J.B. confirmed the incident and stated it made her upset and scared.
This Court also had the chance to speak with E.J.B. in chambers during both Juvenile Court hearings, with all lawyers present. At the time of the hearing in May of 2017, E.J.B. was less than two months shy of turning twelve years old. All lawyers were present and were given the opportunity to question E.J.B. outside the presence of all parties. It was clear to this Court that E.J.B. does fear retaliation by K.L. and there is a history of retaliation by K.L. that E.J.B has experienced. On both occasions in chambers, E.J.B. expressed her wishes to be adopted by L.B. E.J.B. stated that she understood what it meant to be *973 adopted and that she wanted to be adopted by L.B. E.J.B. went on to state that she believed L.B. would allow her to have contact with K.L. Further, the attorney appointed to represent the interest of E.J.B. advocated that after meeting with E.J.B. in private and questioning of all parties that it would be in the best interest of E.J.B. to be adopted by L.B.
Since E.J.B. was three years old, she has been the subject of emotional abuse by K.L. It is not in E.J.B.'s best interest to continue to allow E.J.B. to be subject to the emotional abuse she has suffered that has come along with the contentious custody dispute. E.J.B. is terrified to say anything nice about C.B. Jr. or L.B. in front of K.L. in fear of K.L.'s reactions. E.J.B.'s fears are not irrational as there was an incident at her therapist's office which was witnessed by the therapist herself. The therapist expressed great concern for E.J.B. after witnessing the incident. This situation has been going on for over two-thirds of E.J.B.'s life and to allow it to continue would be detrimental to E.J.B.'s well-being. In this Court's opinion, L.B. is the person that E.J.B. is most comfortable with. E.J.B. has no hesitation when it comes to L.B. E.J.B. has expressed her love for L.B. and is grateful for the care and affection that L.B. has shown her. E.J.B. is thriving under the attention that L.B. gives to her. It is time for E.J.B. to be able to move on with her life without all the animosity and contentiousness.
It is clear from testimony and evidence that it is in the best interest of E.J.B. to be adopted by L.B.
As noted above, we may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development , supra . When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact's findings, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO , 549 So.2d 840, 844 (La. 1989). After our review of the record, taking into consideration the facts and evidence presented, and for the reasons articulated by the trial court, we find the evidence in this case supports the trial court's conclusion that the proposed adoption was in E.B.'s best interest. Thus, we find no error in the district court's judgment granting the intrafamily adoption of E.B. by L.B.
DECREE
Based on the foregoing, the December 14, 2017 judgment of the district court, granting the petition for intrafamily adoption of E.B. by L.B. is affirmed.
AFFIRMED

As in the first appeal, pursuant to Uniform Rules-Courts of Appeal, Rules 5-1 and 5 -2, the initials of the parties will be used to protect and maintain the privacy of the minor involved in these proceedings.

The faxed letter was dated March 7, 2017.

In this Order, the trial court referred to the child as "E.J.B." instead of E.B."

Exhibit P-17, a Motion to Withdraw by appointed attorney for E.B., Edith Morris, states, in relevant part, "Mover received a letter from Samuel Accardo, Jr., counsel for [K.L.] on October 26, 2015 advising that [K.L.] 'had chosen to not pursue this matter further'."

In spite of this finding, the Third Circuit ultimately reversed the trial court's granting of the adoption upon concluding that the trial court had erred in finding that the adoption was in the child's best interest.

The trial court did not allow counsel for K.L. to enter reports by her psychiatric nurse and her therapist into evidence, on the basis that the nurse and therapist were not present in court to authenticate the documents. Counsel for L.B. objected to the documents as hearsay. The trial court gave counsel for K.L. the opportunity to proffer the exhibits, but counsel declined to do so because the trial court was not going to consider them. Thus, these records are not before us on appeal.

Appellate courts do not review reasons for judgment as a part of the judgment itself. La. C.C.P. art. 1918 ; Burmaster v. Plaquemines Parish Government , 07-1311, p. 1 (La. 8/31/07), 963 So.2d 378, 379 (per curiam ). The written reasons for judgment are merely an explication of the trial court's determinations. State in the Interest of Mason , 356 So.2d 530, 532 (La. App. 1st Cir. 1977). The Louisiana Supreme Court has held, however, that a court of appeal can use reasons for judgment to gain insight into the district court's judgment, and we refer to them now for that purpose. See , Wooley v. Lucksinger , 09-0571 (La. 4/1/11), 61 So.3d 507.