NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-828


IN RE: J.D.P. AND A.N.P.,

APPLYING FOR INTRAFAMILY ADOPTION


**********


APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. A-4-22
HONORABLE STEVE GUNNELL, DISTRICT JUDGE


**********


WILBUR L. STILES
JUDGE


**********


Court composed of Candyce G. Perret, Guy E. Bradberry, and Wilbur L. Stiles, Judges.


REVERSED AND REMANDED.

**B. Lance Person**
**Chris B. Ortte**
**Person & Ortte Law**
**101 Stewart Street**
**Lafayette, LA 70501**
**(337) 595-0900**
**COUNSEL FOR APPELLANTS:**
 **J.D.P.**
 **A.N.P.**

**Lauren C. Heinen**
**Heinen & Guinn Law Firm & Consulting, LLC**
**Post Office Box 1451**
**Jennings, LA 70546**
**(337) 246-7220**
**COUNSEL FOR APPELLANTS:**
 **J.D.P.**
 **A.N.P.**

**C.S.C.**
**In Proper Person**
**135 DV Byrd Lane**
**West Monroe, LA 71292**
**(318) 732-5227**

**Robert J. Sheffield, Jr.**
**Attorney at Law**
**1011 Lakeshore Drive, Ste 402**
**Lake Charles, LA 70601**
**(337) 405-8546**
**COUNSEL FOR MINOR CHILD:**
 **M.R.F.**

**STILES, Judge.**

Appellants J.D.P.[1] and A.N.P. appeal the trial court's denial of their Petition for Intrafamily Adoption, in which J.D.P. seeks to adopt A.N.P.'s minor daughter. For the following reasons, we reverse the trial court's Judgment and remand to the trial court for further proceedings.

## FACTS AND PROCEDURAL HISTORY:

Appellant A.N.P. and Appellee C.S.C. are the biological parents of M.R.F., born on November 5, 2012. A.N.P. and C.S.C. were not married at the time of M.R.F.'s birth. They have never entered into an official custodial judgment, although there was an informal agreement that C.S.C. could have visitation with M.R.F. every other weekend. M.R.F. has always lived with A.N.P. C.S.C.'s visitation with the child appears to have been somewhat inconsistent throughout the years, often due to C.S.C.'s work schedule and the fact that he moved frequently.

C.S.C. was ordered to pay child support to A.N.P. through proceedings filed with the Department of Children and Family Services, Child Support Enforcement. A Judgment rendered March 26, 2014, ordered C.S.C. to pay $622.00 per month to A.N.P., beginning March 1, 2014. A subsequent Consent Judgment rendered January 19, 2018, reduced C.S.C.'s monthly child support obligation to $375.00, effective August 1, 2017. The record shows that there have been periods when C.S.C. either paid less than what he was ordered to pay or paid nothing at all.

Appellants J.D.P. and A.N.P. were married on March 17, 2018. M.R.F. has known J.D.P. since he started dating A.N.P. and, at the time of trial, M.R.F. had been living with Appellants for approximately five and a half years.

---

[1] We use the parties' and minor child's initials for confidentiality purposes. *See* Uniform Rules – Courts of Appeal, Rule 5-2.

On February 24, 2022, Appellants filed a Petition for Intrafamily Adoption asserting that J.D.P. is entitled to adopt M.R.F. without the consent of C.S.C., the biological father, because C.S.C. "has failed to comply with a court order of support without just cause for a period in excess of six months. . . . Accordingly, his parental rights should be terminated." Appellants further assert that it is in M.R.F.'s best interest that J.D.P. be allowed to adopt her.

The Petition for Intrafamily Adoption stated that C.S.C.'s whereabouts were not known. Thus, Mr. Andrew Bougard was appointed to represent C.S.C. in these proceedings. On April 13, 2022, Mr. Bougard enrolled as attorney of record for C.S.C. and filed an Answer and Objection to Petition for Intrafamily Adoption. C.S.C. asserted in his Answer that he "only missed four out of the past six months of child support payments and thus his consent is needed for the adoption." He further asserted this adoption would not be in M.R.F.'s best interest "because he has been in the minor child's life her entire life and they have maintained a very consistent, strong, and loving relationship."

Trial began on July 7, 2022. After A.N.P. testified, there was a discussion among the parties, their attorneys, and the trial court. Mr. Bougard indicated that his client, C.S.C., was "willing to surrender [his] parental rights subject to continued contact with the minor child[.]" The trial court then recessed the proceedings until July 19, 2022.

On July 19, 2022, when trial resumed, C.S.C. informed the court that he had fired Mr. Bougard as his attorney. C.S.C. decided he did not want to surrender his parental rights and instead filed custody proceedings on his own behalf. The trial court informed C.S.C. that even though he had filed a "motion for custody", the adoption proceeding was moving forward, with C.S.C. representing himself. After

hearing the remaining testimony and considering the evidence, the trial court denied Appellants' Petition for Intrafamily Adoption, finding that C.S.C. had just cause for failing to pay his child support as ordered and these proceedings should have been a custody suit, not a termination of parental rights and adoption. Appellants' attorney requested written reasons for judgment.

The trial court stated the following in its Reasons for Ruling, rendered July 21, 2022:

> After reviewing the records and the evidence submitted at the hearing, the Court found that the biological father, [C.S.C.], was late in paying his child support payments in excess of six (6) months twice since August of 2020. However, the Court found that in both of those instances, [C.S.C.] had just cause in not complying with the order as he contending with [sic] the conditions of the COVID-19 pandemic and job stability. [C.S.C.] made payments to address the arrears each time and has paid in full. He has had visitation with the child, until he was cut off from contact with the child by [A.N.P.]. The text messages introduced at the hearing demonstrate that [C.S.C.] was in contact with [A.N.P.] and asked to see the child and to make arrangements for paying child support, but his texts were not answered. Consequently, the Court finds that this matter should not be an adoption/termination of parental rights hearing, but a custody hearing to determine the child support and visitation issues that are still outstanding.

A Judgment was signed on July 25, 2022, denying the "Application for Intrafamily Adoption" filed on behalf of Appellants, "for the reasons stated in the reasons for ruling filed by the Court[,]" and ordering "that the matter be tried in front of the hearing officer for Jefferson Davis Parish so that custody, visitation, and support issues may be determined as to all of the parties involved."

On August 10, 2022, the trial court granted Appellants' motion for suspensive appeal. Appellants' raise four assignments of error:

1. The District Court erred in misapplying the burden of proving just cause against Appellants; the burden is that of [C.S.C.] to prove just cause for failure to pay court ordered child support.

3

2. The District Court erred in finding [C.S.C.] had just cause for his failure to pay child support for a period of greater than six months.

3. The District Court erred by relying on self-serving and uncorroborated testimony to support a finding of just cause.

4. The District Court erred when it failed to consider the best interests of M.R.F. in denying the Petition for Intrafamily Adoption.

## ASSIGNMENTS OF ERROR NOS. 1, 2, AND 3:

As Appellants' first three assignments of error are interrelated, we shall address them together.

A father's consent to the adoption of his child is generally required per La.Ch.Code art. 1193. However, La.Ch.Code art. 1245 provides the consent of a parent may be dispensed with when certain elements are met:

A. The consent of the parent as required by Article 1193 may be dispensed with upon proof by clear and convincing evidence of the required elements of either Paragraph B or C of this Article at the hearing on the opposition and petition.

B. When a petitioner authorized by Article 1243 has been granted custody of the child by a court of competent jurisdiction and one of the following conditions exist:

(1) The parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.

(2) The parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.

C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exist:

(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.

(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.

A.N.P. is the spouse of J.D.P., the stepparent petitioner in this matter. There is no court order granting A.N.P. custody of the child; however, there is no dispute that she has always exercised lawful custody of the child. The Petition for Intrafamily Adoption asserts that C.S.C. "has failed to comply with a court order of support without just cause for a period in excess of six months." There has been no allegation, either in the petition or at trial, that C.S.C. has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months. Thus, La.Ch.Code art. 1245(C)(1) applies to this matter.

> The party petitioning for adoption has the initial burden of proving that a biological parent's consent is not required due to the parent's nonsupport of or lack of communication with the child by clear and convincing evidence. *In re Orgeron*, 94-458 (La. App. 5 Cir. 11/16/94), 646 So.2d 1137, 1139; *In re R.A.L.*, 54,052 (La. App. 2 Cir. 7/14/21), 323 So.3d 1006, 1015-16. Once a *prima facie* case is proven, the opposing parent then has the burden of proving that his failure to provide support or communicate with his child was with "just cause," or due to factors beyond his control. *In re C.B.*, 94-0755 (La. 10/17/94), 643 So.2d 1251, 1253; *In re D.D.D.*, 06-2274 (La. App. 1 Cir. 5/4/07), 961 So.2d 1216, *reheating denied*, *writ denied*, 07-1669 (La. 8/31/07), 962 So.2d 436, *certiorari denied*, 552 U.S. 1195, 128 S.Ct. 1243, 170 L.Ed.2d 85 (2008). The trial court must thereafter consider whether the adoption is in the best interest of the child. *In re Orgeron*, *supra*.

*In re J.W.R.*, 21-691, pp. 4-5 (La.App. 5 Cir. 3/3/22), 340 So.3d 1242, 1246-47.

On review of a decision regarding intrafamily adoption, an appellate court "should affirm the trial court where the judgment is not clearly wrong or manifestly erroneous because the determination of whether the adoption is in the best interest of the child must be decided on the facts of each case." *Id.* at 1247. We consider the present matter under that standard.

5

Appellants assert that they proved a prima facie case that C.S.C. failed to pay court ordered child support payments for a period of more than six months, on two separate occasions. A.N.P. testified that C.S.C. failed to pay his court ordered child support payments from August of 2020 through February 2021, a period of seven months. She further testified that he again failed to make payments between August of 2021 and February of 2022, a period of six months. In support of these assertions, A.N.P. introduced at trial a copy of C.S.C.'s payments and arrearages as shown on the Department of Children and Family Services' website, as well as her bank statements from First Guaranty Bank.

A.N.P.'s bank records indicate that she received a child support payment from C.S.C. on July 15, 2020. She then did not receive another child support payment from C.S.C. until March 19, 2021, seven months later. C.S.C. did not refute this information. Thus, Appellants have proven by clear and convincing evidence that C.S.C. failed to provide support for M.R.F. for a period of seven months, August of 2020 through February of 2021.

A.N.P.'s bank records indicate that C.S.C. continued to pay his child support from March 19, 2021 through August 25, 2021. However, no child support payments were received by A.N.P. from September of 2021 through February of 2022. C.S.C.'s next child support payment shows up on A.N.P.'s bank statement dated March 16, 2022. Thus, per these bank statements, Appellants have proven by clear and convincing evidence that C.S.C. failed to provide support for M.R.F. for six months, making this his second occasion of failing to comply with the court order of support. We note the Petition for Intrafamily Adoption was filed on February 24, 2022.

The record shows that when C.S.C. made a child support payment, the money would go straight to the Department of Child and Family Services and then be sent from them to A.N.P.'s bank account. The information on the Department's website, a copy of which was filed in the record, indicates that C.S.C. made a payment on August 23, 2021. His next payment to the Department of Child and Family Services was made on February 24, 2022, meaning that he did make a payment, although at the very end of the six-month period. These payments were deposited into A.N.P.'s bank account on August 25, 2021 and March 16, 2022, respectively. It appears that there is a delay between the time C.S.C. submits a child support payment to the Department of Child and Family Services and the time it is deposited into A.N.P.'s bank account. We also consider the fact that the February 24, 2022 payment was $173.07, which is only 8% of the full amount of child support owed by C.S.C. for the six months between September 2021 and February 2022.

Even should we consider the $173.07 payment as being made on February 24, 2022, when it was received by the Department of Child and Family Services, and not on March 16, 2022, when it was received by A.N.P.'s bank, we do not find that this sole payment in the entire six-month period is significant enough to allow C.S.C. to prevent the adoption of M.R.F. by withholding his consent. *See Anderson v. Ramer*, 27,469 (La.App. 2 Cir. 9/27/95), 661 So.2d 584; *Tutorship of Shea*, 619 So.2d 1236 (La.App. 3 Cir. 1993), *writ denied*, 626 So.2d 1165 (La.1993). "Whether the support provided is 'significant' depends on the particular facts and circumstances of the case under consideration." *Tutorship of Shea*, 619 So.2d at 1241, citing *Haynes v. Mangham*, 375 So.2d 103 (La.1979). The records submitted from the Department of Child and Family Services' website indicate that C.S.C. was in arrears in the amount of $5,332.66 as of May 2, 2022. While C.S.C. did pay a total

7

of $4,935.39 on May 31, 2022, he was still in arrears in the amount of $1,125.66 as of July 6, 2022. Jurisprudence has held that child support payments tendered after a petition for intrafamily adoption has been filed "cannot serve to negate the purposes" of the adoption statute. *State in Interest of Shroeder*, 470 So.2d 250, 252 (La.App. 4 Cir. 1985). *See also, In re Coile*, 343 So.2d 325 (La. App. 2 Cir. 1977), *writ refused In re Hanson*, 345 So.2d 902 (La. 1977); *Bailey v. Bailey,* 335 So.2d 694 (La.App. 2 Cir. 1976).

Considering the particular facts and circumstances of this case, we find that Appellants have proven by clear and convincing evidence that C.S.C. failed to pay his court ordered child support for one period of seven months (August 2020 through February 2021) and a second period of six months (September 2021 through February 2022). The sole payment of $173.07 made on February 24, 2022/March 16, 2022 was not significant enough, when considering the entirety of the record, to allow C.S.C. to prevent the adoption of M.R.F. by withholding his consent. Nor shall the additional payment of $4,935.39 on May 31, 2022, be considered sufficient so as to require C.S.C.'s consent to the adoption as it was tendered after the Petition for Intrafamily Adoption was filed.

As Appellants have proven by clear and convincing evidence that C.S.C. failed to comply with a court order of support for a period of at least six months, the burden then shifts to C.S.C. to prove he had "just cause" for failing to make those payments. Appellants assert in their brief, however, that "the District Court failed to hold this burden against [C.S.C.], and instead attempted to carry the burden itself based on its own unsubstantiated recollection of the Covid-19 timeline and assumed restrictions on [C.S.C.]'s ability to earn income." They further assert that there was no evidence presented at trial, other than C.S.C.'s and his mother's self-serving

testimony, to show that C.S.C. was unable to pay his child support obligation due to unemployment caused by the Covid-19 pandemic.

A parent's burden of proving just cause was addressed in the case *In re B.E.M.*, 07-94, p. 5 (La.App. 5 Cir. 5/29/07), 961 So.2d 498, 502:

> Once it is shown that a parent did not comply with the court order of support, the burden shifts to the parent to prove by a preponderance of the evidence that he or she had just cause for the failure to support the child. *State in the Interest of M.L. and P.L.*, 95-0045 (La.9/5/95), 660 So.2d 830. Just cause is an affirmative defense and the parent bears the burden of proving that he/she had just cause for not paying child support or that the failure to pay child support resulted from circumstances out of his/her control. *In re Sevin*, 97-1145 (La. App. 5th [Cir.] 5/13/98), 712 So.2d 998.

*See also, In re L.D.B.*, 18-205 (La.App. 5 Cir. 10/17/18), 258 So.3d 963, *writ denied*, 18-1864 (La. 2/11/19), 263 So.3d 1151. Thus, C.S.C. was tasked with proving by a preponderance of the evidence that he had just cause for failing to pay child support. "Proof by a preponderance of the evidence means that the evidence, taken as a whole, shows that the fact or cause sought to be proven is more probable than not." *Crowell v. City of Alexandria*, 558 So.2d 216, 217 (La.1990).

P.B., C.S.C.'s mother, was questioned by Appellants' attorney, Ms. Heinen, about C.S.C.'s child support payments:

> Q.     Are you aware of child support payments that were made and not made when it comes to [C.S.C.] and [M.R.F.]?
>
> A.     Any time [C.S.C.] has a job, he goes through where they garnish his wages. If he is in between jobs, I don't know what goes on there. I don't know if he's paying or not paying. I don't know any of that. I do know that he does for his child. His child is important to him. So I do know that when he's out of a job, like when he was laid off for Covid, I think there was some times there that he wasn't able to pay. When he's got a job, he does - - he sets it up for the garnishment, okay.
>
> I know that there was something about birthdays or something like that. He's even taken care of like fun jumps and stuff like that. He loves his child, okay, and when he - - when he's able to do, he does.

When he's got a job, he garnishes his wages. People go in and out of jobs especially with this Covid stuff, okay, but when he got a job, he went and he set up the garnishment. He didn't wait for any kind of court order to do it. He went and he done it. Now, as to however many times he didn't or did, you know, when he was out of work, I don't know those things. I'm not - - you know, we don't talk about those things. I mean, that's private for him. You know, that's not my business.

When C.S.C. was called upon to present his opposition to the adoption, he testified as follows about his child support obligation:

THE COURT:

All right. Now - -

All right. You're not represented by counsel. You have the right to tell the Court why your parental rights should not be terminated, okay.

THE WITNESS [C.S.C.]:

Okay. Yes, I've been back and forth with my child support. It's hard especially with Covid going on. I have contacted our - - the state - - the lady that's in charge of our child support to give them my new job. The guy told me that she was going to return my call, and she still has not returned my call, and this has been since I started this new job that I have. So I'm waiting on their process to het it - - start - - to get garnishing. Every time I've been beyond on child support, I've always caught it up. "Always." I - - my income tax just went straight to whatever I owed from January. Yes, I'm behind a little bit right now. It's 1,100, but I will catch up.

Other than the testimony cited above, there was no further mention of Covid-19 or the resulting pandemic by any other party or witness. Thus, there are only three statements in the entire record that suggested Covid-19 may have affected C.S.C.'s ability to pay child support. The first two statements were made by P.B. when she testified: "So I do know that when he's out of a job, like when he was laid off for Covid, I think there was some times there that he wasn't able to pay[;]" and "People go in and out of jobs especially with this Covid stuff[.]" The third statement was made by C.S.C.: "It's hard especially with Covid going on." Neither C.S.C. nor P.B.

specified where, or if, C.S.C. was working during the periods he failed to pay child support (August 2020 – February 2021 and September 2021 – February 2022). Nor did C.S.C. indicate if he had been laid off or fired during those periods, and if so, for what reason. No employment records or medical records were introduced at the trial, which might have provided information on C.S.C.'s employment history during those two time periods. As the appellate court held in *In re Lambert*, 545 So.2d 1122, 1123 (La.App. 5 Cir.), *writ denied*, 548 So.2d 338 (La.1989), "The transcript contains nothing more than his flat statement and does not fulfill the burden of proving just cause."

The following colloquy occurred at the end of the trial, when the matter had been submitted to the trial court and it was preparing to issue its ruling:

THE COURT:

All right. This is the situation I have: When we were here at the last hearing, he did go over six months, okay, without paying, but if I remember correctly, that was during Covid, okay.

MS. HEINEN [Appellants' attorney]:

Your honor, there were two instances.

THE COURT:

I know, but - - I mean, he rectified that, okay.

The one y'all were talking about was this one six months, what was it again? Let me make sure I understand.

MS. HEINEN:

Yes, your honor.

THE COURT:

Okay. Well, let's just go ahead and we'll just pass on that because the question is six months. You're saying that he had one six months. I say it was Covid. He argued it was Covid.

And what are the dates between those six months?

MS. HEINEN:

Your honor, so we have the - - let's see. 8/25/21 was the last payment.

THE COURT:

Okay.

MS. HEINEN:

Hang on. I have it all in my closing here.

So from 8/25/21 to 3/16/22.

THE COURT:

That is during Covid, okay.

MS. HEINEN:

And then the time before that - -

THE COURT:

You have it, Mr. Sheffield?

MR. SHEFFIELD [M.R.F.'s appointed attorney]:

Yes, Your Honor. The - - the information that I was given looks like there was a period of almost seven months from August of 2020 through February of 2021.

THE COURT:

Okay. That's still during Covid, okay.

So, all right, he may have just cause, all right.

As asserted by Appellants, the trial court relied on its own recollections of the Covid pandemic when finding C.S.C. "may have just cause." "The District Court merely associated the months of C.S.C.'s non-payments to the Court's recollection of when Covid-19 affected employment." C.S.C. never actually argued that he was

unable to pay child support due to Covid-19 and certainly never provided any evidentiary support for such an argument. He therefore failed to prove by a preponderance of the evidence that he had "just cause" for the failure to support M.R.F. during the months listed.

For these reasons, we find that the trial court was clearly wrong and manifestly erroneous in finding that C.S.C. had just cause in failing to comply with the court order of support for a period of at least six months. We further find that because Appellants have proven by clear and convincing evidence that C.S.C. failed to comply with a court order of support without just cause for a period of at least six months, C.S.C.'s consent is not required for J.D.P. to adopt M.R.F. The trial court's judgment finding "just cause" is reversed.

### ASSIGNMENT OF ERROR NO. 4:

Appellants have asserted in their final assignment of error that the trial court failed to consider the best interest of M.R.F. when it denied the Petition for Intrafamily Adoption. While we have found that C.S.C.'s consent is no longer required for the adoption, we note that the best interest of M.R.F. must still be considered before the adoption may be granted.

This court held in *W.P.H. for Adoption of A.A.B.*, 22-141, p. 12-13, (La.App. 3 Cir. 10/12/22), 349 So.3d 1120, 1128:

> The best interests of the children are the paramount concern in all cases involving the custody of children, including stepparent adoptions and the termination of the parental relationship. [*Adoption of*] Latiolais, 376 So.2d 555 [(La.App. 3 Cir. 1979), *writ granted*, 379 So.2d 11 (La.1980), *aff'd*, 384 So.2d 377 (La.1980)]; *In re K.L.H.*, 771 So.2d 706. In *Adoption of Latiolais*, 384 So.2d 377, 378 (La. 6/23/80), the supreme court affirmed the court of appeal's ruling reversing the trial court's grant of adoption in favor of the stepparent and stated that, "The best interest of the child is the major standard to which a court must look before it can determine when or whether to order an adoption." Even if W.P.H. had proven by clear and convincing

evidence that N.B.'s consent was not required because he failed to support or visit his children for a period greater than six months, we find the trial court manifestly erred in finding that it would be in the children's best interest to terminate their biological father's parental rights.

This court further discussed the issue of best interest of the child in *In re K.L.H.*, 99-1995, p. 5 (La.App. 3 Cir. 9/20/00), 771 So.2d 706, 709-10 (emphasis in original):

> As noted, a parent may lose the right to consent to the adoption of her child as provided by La.Ch.Code articles 1193 and 1245(D)(1), but the adoption should only be granted when it is in the best interest of the child. *Adoption of Latiolais*, 384 So.2d 377 (La.1980). The party petitioning the court for adoption carries the burden of proving *the adoption is in the best interest of the child. In re JMP*, 528 So.2d 1002 (La. 1988); *Wyatt v. Dep't. of Public Welfare*, 442 So.2d 1369 (La.App. 3 Cir. 1983).
>
> Whether an adoption is in the best interest of the child must be decided on the facts of each case, and the trial judge is vested with great discretion in making that determination. *In re Farrar*, 93-1347 (La.App. 3 Cir. 4/6/94); 635 So.2d 674. However, this discretion is not absolute and the trial judge's best interest determination is subject to reversal if the record reveals it was manifestly erroneous. *Latiolais*, 384 So.2d 377.
>
> This court in *In re Farrar*, 635 So.2d at 676-77 thoroughly reviewed the applicable law and jurisprudence concerning adoption. We stated:
>
> > In reviewing the law in the area of adoption, we note that there is no clear definition or absolute outline of factors that should be used in determining what is in the best interest of a child. Louisiana courts have cited several factors including the ability of the stepparent to serve as parent, the ability of the stepparent to provide for the child's physical needs, the stepparent's ability to fulfill the psychological needs of the child, and lastly, whether the aforementioned considerations outweigh the existent natural parent-child relationship. *In re Billeaud*, 600 So.2d 863, 865 (La.App. 3d Cir.1992). More specifically, where a stepparent is married to the natural parent having custody and seeks to adopt that child, Louisiana courts have held:
> >
> > > The most important factors are the child's relationship with h[is] stepfather and h[is] natural

> father. It is not enough to examine the love and home environment provided by the petitioner/stepparent. It is necessary as well to examine the depth of closeness of the child's ties with the non-custodial natural parent, and the effect which the loss of this relationship would have on the child. *In Re JGG v. JLF*, 556 So.2d 236 (La.App. 2d Cir.1990). The court must also consider the seriousness and finality of the severing of the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent. *Id.*

*Knapp v. Adoption of Cotten*, 577 So.2d 241, 246 (La.App. 1st Cir.), *writ denied*, 580 So.2d 364 (La.1991). Consequently, a court, for example, cannot automatically grant a stepparent's petition for adoption even where the relationship between a stepfather and his stepson is closer and more affectionate than the relationship between the son and his natural father. The law requires that the court also evaluate the relationship between the child and the natural parent and the effect on the child of severing the natural parent-child relationship.

Thus, even though C.S.C.'s consent is not required for J.D.P. to adopt M.R.F., the best interest of M.R.F. must be considered as it is the most important concern in deciding whether to grant or deny the adoption.

Multiple witnesses testified at trial, on behalf of both sides, as to the close relationships M.R.F. has with both J.D.P. and C.S.C.

Appellants both testified that M.R.F. considers J.D.P. as a father figure and he is raising her as his daughter. When J.D.P. is not at work, he helps M.R.F. with homework and coaches her soccer and softball teams. This testimony was corroborated by that of B.F. (A.N.P.'s father), C.P. (J.D.P.'s mother), and K.B. (M.R.F.'s godmother). Appellants' house is close to multiple members of J.D.P.'s family and M.R.F. has access to grandparents, aunts, uncles, and cousins.

There was also testimony supporting M.R.F.'s relationship with C.S.C. Though his visitation with M.R.F. can be spotty at times due to his work hours and the fact that he lives in another city, C.S.C. testified that M.R.F. is "extremely

15

important" to him. "She's a big part of my life, and I can't lose her, and I will not lose her." C.S.C. acknowledged that while he may have trouble paying child support on occasion, he has always helped with M.R.F.'s birthday parties and often paid for a fun jump. C.S.C. also made a point to spend part of Christmas day with M.R.F. this past Christmas. S.C. (C.S.C.'s wife) and P.B. (C.S.C.'s mother) both corroborated this testimony and expressed how much M.R.F. means to C.S.C.

The trial court appears to have addressed the issue of M.R.F.'s best interests in both its oral ruling at trial and its written reasons for ruling. At trial, the court referred to its belief that while J.D.P. is a "great stepfather", C.S.C. "is still the father of the daughter, and he knows the daughter." In its written reasons for ruling, the trial court found C.S.C. "has had visitation with the child, until he was cut off from contact with the child by [A.N.P.][,]" and that "text messages introduced at the hearing demonstrate that [C.S.C.] was in contact with [A.N.P.] and asked to see the child and to make arrangements for paying child support, but his texts were not answered." However, the trial court never explained what factors or evidence it considered and whether those factors or evidence determined if it was in M.R.F.'s best interest that she be adopted by J.D.P. Instead, the trial court stopped short at finding C.S.C. had just cause for his failure to pay the court ordered child support, and his consent to the adoption was therefore required.

As the trial court remains in the best position to hear testimony, evaluate the evidence introduced, and determine the best interest of the child, we remand this matter to the trial court, with instructions to the trial court to consider the best interest of the child before deciding whether to grant or deny the Petition for Intrafamily Adoption.

## DECREE:

For the aforementioned reasons, we reverse the trial court's July 25, 2022 judgment, which denied the Petition for Intrafamily Adoption filed by Appellants J.D.P. and A.N.P. We do not render further judgment, and instead remand this matter to the trial court for further proceedings consistent with this opinion. Costs of this proceeding are assessed to Appellee C.S.C.

**REVERSED AND REMANDED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Rule 2-16.3 Uniform Rules, Courts of Appeal.